UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIO PEREZ,<br><br>Plaintiff,<br><br>-v-<br><br>PROGENICS PHARMACEUTICALS, INC.,<br><br>Defendant. | Case No. 10-CV-8278 (KMK)<br><br>OPINION AND ORDER |

Appearances:

Julio Perez
273D South Broadway
Tarrytown, New York
*Pro Se Plaintiff*

Eric David Raphan, Esq.
Jonathan Stoler, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiff Julio Perez, proceeding pro se, brings this action against Defendant Progenics

Pharmaceuticals, Inc. ("Progenics"), alleging that Defendant violated the Sarbanes-Oxley Act of

2002 ("Sarbanes-Oxley"), 18 U.S.C. § 1514A, by terminating Plaintiff's employment in

retaliation for a memorandum he wrote regarding a press release about a pharmaceutical drug.

Defendant now moves for summary judgment.  For the reasons stated herein, Defendant's

Motion is denied.

<u>I. Background</u>

<u>A. Factual Background</u>

<u>1. The Parties</u>

The following facts are drawn from the Parties' submissions and are undisputed except as otherwise indicated.  Progenics is a biotechnology company located in Tarrytown, New York and has been publicly traded on the NASDAQ stock exchange since 1997.  (Def.'s Rule 56.1(a) Statement ("Def. 56.1") ¶¶ 1-2; Pl.'s Rule 56.1(a) Statement ("Pl. 56.1") ¶¶ 1-2; Decl. of Jonathan Stoler Ex. K ("Maddon Dep.") 13.)[1]  Plaintiff, who has a Ph.D. and a master's degree in organic chemistry, worked for approximately eleven years as a chemist at two pharmaceutical companies prior to his employment at Progenics.  (Def. 56.1 ¶¶ 3-4; Pl. 56.1 ¶¶ 3-4; Decl. of Jonathan Stoler Ex. C ("Perez Dep.") 40-43, 64-67; *id.* Ex. M ("Pl. Resume").)  In May 2004, Progenics hired Plaintiff as a Senior Manager of Pharmaceutical Chemistry, a position he held during his entire employment with Progenics.  (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5; Perez Dep. 70-73.) On May 3, 2004, Plaintiff signed an Employee Patent Assignment and Confidentiality Agreement, which required Plaintiff "to preserve in confidence, and not to use, to publish, or to otherwise disclose . . . , either during or subsequent to [Plaintiff's] employment, without the written permission of Progenics, all confidential proprietary rights or any knowledge, . . . or any other confidential information of Progenics, its customers, or others from whom Progenics has received information under obligations of confidence."  (Def. 56.1 ¶¶ 6-7; Pl. 56.1 ¶¶ 6-7; Decl. of Jonathan Stoler Ex. L ("Confidentiality Agreement") ¶ 3; Perez Dep. 78.)

---

[1]  The Court notes that it considered the full transcripts of the depositions in the record rather than the excerpts originally provided by Defendant in support of the Motion.

<u>2.  Relistor Development and Clinical Trials</u>

While employed at Progenics, Plaintiff's primary responsibility was to support development of Relistor, a pharmaceutical drug designed to treat patients suffering from post-operative bowel dysfunction or opioid-induced constipation.  (Def. 56.1 ¶¶ 8-9; Pl. 56.1 ¶¶ 8-9; Perez Dep. 73, 84-9; Decl. of Bruce Schneider ("Schneider Decl.") ¶ 4.)  Specifically, Plaintiff's responsibilities included working on Relistor's oral, subcutaneous, and intravenous formulations to "figur[e] out ways that the oral form of Relistor could be better absorbed by the human body," working on supply of the active pharmaceutical ingredient (methylnaltrexon) in Relistor, and supporting activities related to clinical trials—although Plantiff himself did not perform the clinical trials.  (Def. 56.1 ¶¶ 10-11; Pl. 56.1 ¶¶ 10-11; Perez Dep. 75, 85-88.)  The Parties agree that Plaintiff had no responsibility for the marketing and commercialization of Relistor; that Plaintiff did not hold any sales, marketing, or public relations positions; and that Plaintiff did not perform any job duties in those areas.  (Def. 56.1 ¶¶ 11-12; Pl. 56.1 ¶¶ 11-12; Perez Dep. 53.)

In December 2005, Progenics and another pharmaceutical company, Wyeth Pharmaceuticals Division ("Wyeth"), entered into a License and Co-Development Agreement (the "Progenics-Wyeth Agreement") to co-develop and jointly commercialize Relistor.  (Def. 56.1 ¶¶ 13-14; Pl. 56.1 ¶¶ 13-14; Decl. of Jonathan Stoler Ex. N ("Progenics-Wyeth Agreement"); Schneider Decl. ¶ 5.)  The Progenics-Wyeth Agreement established three joint committees composed of members from both Progenics and Wyeth: a Joint Steering Committee ("JSC"), a Joint Development Committee ("JDC"), and a Joint Commercialization Committee ("JCC").  (Progenics-Wyeth Agreement § 3.2-3.4.)  The JSC was to be responsible "for the overall strategic and operational direction of the Parties' collaboration under th[e] Agreement"; the JDC was tasked with "overseeing, coordinating and expediting the Development of the

Compound and the Products"; and the JCC was to "facilitate the exchange of information between the Parties regarding the Commercialization of the Products."[2]  (*Id.*; Def. 56.1 ¶¶ 15-17; Pl. 56.1 ¶¶ 15-17.)  Pursuant to the Progenics-Wyeth Agreement, the companies also agreed to a Joint Development Plan to "govern all aspects of Development of the Products worldwide," which the JSC endorsed on or around May 11, 2006.[3]  (Def. 56.1 ¶¶ 19-20; Pl. 56.1 ¶¶ 19-20; Progenics-Wyeth Agreement § 4.1; Decl. of Jonathan Stoler Ex. O (the "Development Plan"); Schneider Decl. ¶ 8.)

The Development Plan included draft Target Product Profiles (the "TPP"), "represent[ing] the technical and commercial targets."  (Development Plan 7.)  According to Defendant, the TPP was merely a "wish list" and a "marketing concept intended to help assess the commercial viability of a drug and its performance against competitive products."  (Def. 56.1 ¶¶ 21-22; Maddon Dep. 56-57 (stating that TPP is "a phrase that describes the marketing" and is "generally established by commercial people"); *see also* Decl. of Jonathan Stoler Ex. E ("Boyd Dep.") 40; *id.* Ex. J ("Lukacsko Dep.") 70, 74-75, 344, 358-59, 361; *id.* Ex. D ("Wong Dep.") 153-54; Schneider Decl. ¶ 9.)  According to Plaintiff, the TPP was more significant than a wish list:  It "specifies the labeling concepts that are the goals of the drug development program [and] documents the specific studies intended to support the labeling concepts."  (Pl. 56.1 ¶ 21; Decl. of Julio Perez Ex. 9 ("FDA TPP Guidance") 2 (also noting that "[t]he ideal version of what the sponsor would like to *claim in labeling* guides the design, conduct, and analysis of clinical trials to maximize the efficiency of the development program" (emphasis in original)); *see also* Perez

---

[2]  The Parties disagree as to whether the JDC reported to the JSC, (*see* Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16), but this dispute is immaterial.

[3]  Plaintiff argues that because the JDC was to be updated "on an as-needed basis, but in no event less than once annually," (Progenics-Wyeth Agreement § 4.1), the May 2006 Development Plan was valid only until May 2007, (Pl. 56.1 ¶ 20).  This dispute is immaterial.

Dep. 62-63 (listing commercial viability as only one of several factors in a drug's TPP); Boyd

Dep. 40 (explaining that a TPP includes "cost of goods, clinical endpoints, commercial viability,

things like that").)

In order to gain FDA approval for public sales of oral Reslistor, Progenics and Wyeth

were required to conduct several phases of clinical trials demonstrating its safety and efficacy.

(Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28; Boyd Dep. 17; Decl. of Jonathan Stoler Ex. G ("Baker Dep.") 46-

49; Wong Dep. 119.)  Each clinical trial phase had written protocols with primary and secondary

endpoints.  (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29; Wong Dep. 120, 132-33; Lukacsko Dep. 89-90; Boyd

Dep. 99.)  From October 2007 until April 2008, the companies conducted a Phase 2 clinical trial

on a tablet formulation of oral Relistor (the "2201 Study").[4]  (Def. 56.1 ¶¶ 40-41; Pl. 56.1 ¶¶ 40-

41; Decl. of Jonathan Stoler Ex. T ("2201 Study Final Report") 1; Schneider Decl. ¶ 18.)

According to the written protocol, the 2201 Study was a "hypothesis generating trial,"and "[t]he

endpoints that w[ould] drive decision-making [we]re the proportion of subjects having a

spontaneous bowel movement within 3 hours of the first dose of test article and the proportion of

subjects discontinuing prematurely during the first week of active dosing for efficacy and

---

[4]  Prior to the 2201 Study, from August 2006 to February 2007, Wyeth and Progenics had
conducted a Phase 2 clinical trial (the "200 Study") on a capsule formulation with an enteric
coating used to control where the drug would be absorbed in the digestive system.  (Def. 56.1
¶¶ 33-35; Pl. 56.1 ¶¶ 33-35; Schneider Decl. ¶ 12.)  The Parties agree that the JSC abandoned
this formulation after the 200 Study failed to show "statistically significant differences among
the treatment groups." (Def. 56.1 ¶¶ 36-37; Pl. 56.1 ¶¶ 36-37; Decl. of Jonathan Stoler Ex. Q
("200 Study Final Report") 17.)  And, on March 6, 2007, Wyeth and Progenics issued a joint
press release stating that "the initial formulation of oral methylnaltrexone was generally well
tolerated but did not exhibit sufficient clinical activity to advance into [P]hase 3 testing," and
announcing that clinical testing of a different formulation would begin that month.  (Def. 56.1
¶¶ 38-39; Pl. 56.1 ¶¶ 38-39; Decl. of Jonathan Stoler Ex. R ("March 2007 Press Release");
Schneider Decl. ¶¶ 16-17.)

tolerability respectively."[5]  (Def. 56. 1 ¶ 42; Pl. 56.1 ¶ 42; Decl. of Jonathan Stoler Ex. S ("2201

Study Protocol") 21-22; Maddon Dep. 44-45.)  In any event, the 2201 Study demonstrated that

the tablet formulation of oral Relistor showed statistically significant activity for some dosages,

(Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44; Lukacsko Dep. 197-98, 378-82, 449; Decl. of Jonathan Stoler Ex.

U ("2201 Study Results PowerPoint") 3856-61; *id.* Ex. W ("July 16, 2008 PowerPoint") 23-25;

Schneider Decl. ¶ 21), but to date, there has been no Phase 3 clinical trial of this formulation,

(Def. 56.1 ¶ 53; Pl. 56.1 ¶ 53).[6]  Plaintiff claims that the 2201 Study did not show clinically

important activity.  (Pl. 56.1 ¶ 44; Decl. of Julio Perez Ex. 7 ("July 9, 2008 JDC/JSC Meeting

Minutes") 2 ("The level of efficacy observed in the tablet study has marginal clinical or

commercial value . . . .."); Wyeth Update 32).  On May 22, 2008, Wyeth and Progenics issued a

joint press release, stating that "a [P]hase 2 trial[] evaluated the effects of an oral formulation of

Relistor," which "showed positive activity," and "statistically significant activity as assessed by

the occurrence of spontaneous bowel movements and other efficacy measures."  The press

release also included a quote from then Progenics CEO, Dr. Paul J. Maddon:  "'We are pleased

by the preliminary findings of this oral formulation.'"  (Def. 56.1 ¶¶ 48-49; Pl. 56.1 ¶¶ 48-49;

Decl. of Jonathan Stoler Ex. V (the "May 2008 Press Release") 1-2.)

---

[5]  Defendant claims that there were no "specific criteria" established for the trials to advance to Phase 3.  (Def. 56.1 ¶ 43; Schneider Decl. ¶ 20.)  Plaintiff claims that the companies had specific and predetermined criteria.  (Pl. 56.1 ¶ 43; Decl. of Julio Perez Ex. 4 ("Jan. 15, 2008 PowerPoint") 8 (slide entitled "Advancement Criteria"), 12 (slide entitled "Criteria for Advancing to Phase 3"), 13 (slide entitled "Draft Decision Matrix: Oral Formulations"); *id.* Ex. 5 ("Jan. 15, 2008 JDC/JSC Meeting Minutes") 2 ("[S]tudy results that would define the criteria to validate initiation of the [P]hase 3 program were discussed."); *id.* Ex. 6 ("July 9, 2008 PowerPoint") 76-82.)

[6]  Defendant claims that no decision was made with respect to advancing to a Phase 3 clinical trial before the May 2008 Press Release, (Def. 56.1 ¶¶ 51, 53; Schneider Decl. ¶ 42), but Plaintiff disputes this.  (Pl. 56.1 ¶¶ 51, 53; Lukacsko Dep. 237-40, 298-300; 302-304, 309-10, 443-44, 491-92; Decl. of Julio Perez Ex. 10 ("May 20, 2008 email").)

On July 16, 2008, executives in Wyeth's commercial operations and research and development groups presented the Relistor Development Strategy Update (the "Wyeth Update"), to Wyeth's Executive Development Council.  (Def. 56.1 ¶¶ 55-56; Pl. 56.1 ¶¶ 55-56; Wyeth Update; Schneider Decl. ¶¶ 26-27.)  No Progenics employees, including Plaintiff, participated in the meeting.  (Def. 56.1 ¶ 57; Pl. 56.1 ¶ 57; Baker Dep. 117; Boyd Dep. 232; Schneider Decl. ¶ 28.)  The Wyeth Update assessed various oral formulations under development, specifically noting that "[r]esults from oral Phase 2 studies demonstrated that neither the tablet nor the capsule formulations had sufficient activity to satisfy the Confirm advancement criteria specified in the approved target product profile."  (Wyeth Update 2, 34.)  The Wyeth Update formally recommended that the tablet formulation not advance to Phase 3 clinical trials:  Although some dosages of the tablet formulation demonstrated statistically significant results, and "rapid and predictable results" occurred with the first dose, (Def. 56.1 ¶¶ 61-62; Pl. 56.1 ¶ 61; Wyeth Update 23, 25), other targets for the drug were "not met," (Pl. 56.1 ¶ 62; Wyeth Update 32).  According to Defendant, Wyeth decided to engage in further discussions with Progenics and review additional data before making a decision about advancing to Phase 3, (Def. 56.1 ¶ 65; Schneider Decl. ¶ 30), but Plaintiff claims that Wyeth endorsed the recommendation not to advance at the July 16, 2008 meeting, (Pl. 56.1 ¶ 65; Decl. of Julio Perez Ex. 12 ("July 16, 2008 Meeting Results") 4 ("DECISION: EDC endorsed the team's proposal to reconsider options for an oral Phase 3 program in JAN09.")).

In or around late July 2008, Mark Baker, general counsel of Progenics, received a copy of the Wyeth Update from Dr. Richard Krawiec, another employee of Progenics.[7]  (Def. 56.1

---

[7]  Defendant claims that Sal Foti, a Wyeth executive responsible for corporate communications, delivered a copy of the Wyeth Update to Richard Krawiec.  (Def. 56.1 ¶ 66.)  However, the only supporting evidence in the record for this position is Baker's testimony that Foti gave it to Krawiec, who then gave it to Baker.  (Baker Dep. 123-24.)

¶ 66; Pl. 56.1 ¶ 66; Baker Dep. 123-24.)  Baker then distributed the Wyeth Update to five members of Progenics's senior management team, not including Plaintiff.  (Def. 56.1 ¶¶ 69-70; Pl. 56.1 ¶¶ 69-70; Baker Dep. 172.)  Plaintiff claims that "towards the end of July 2008," he received the Wyeth Update via interoffice mail.  (Perez Dep. 94-95, 98.)

### 3.  Plaintiff's Termination

On August 4, 2008, Plaintiff delivered a memorandum (the "August 4, 2008 Memorandum"), "Comments on oral Relistor [P]hase 2 clinical trial results," to Baker and Dr. Thomas Boyd, Senior Vice-President of Product Development at Progenics, identifying statements in the May 2008 Press Release.  In this Memorandum, Plaintiff wrote:  "[Wyeth and Progenics] are committing fraud against shareholders since representations made to the public were not consistent with the actual results of the relevant clinical trial, and [Plaintiff] think[s] this is illegal."  (Decl. of Jonathan Stoler Ex. X ("August 4, 2008 Memorandum") 2; Def. 56.1 ¶ 73; Pl. 56.1 ¶ 73; Perez Dep. 118-22; Baker Dep. 168-69.)  Plaintiff attached three items to the Memorandum: selected slides from the Wyeth Update, the May 2008 Press Release, and an article entitled "Learn and Confirm" written by Wyeth managers.  (August 4, 2008 Memorandum.)

Plaintiff and Defendant have different accounts of what happened next.  Plaintiff claims that around lunchtime on August 4, 2008, Baker told him "in hostile words" that his computer had been removed and did not make any comment on the Wyeth Update.  (Pl. 56.1 ¶¶ 85, 87; Perez Dep. 166-68.)  Defendant claims that after receiving the August 4, 2008 Memorandum, Baker went to Plaintiff's office to ask how Plaintiff obtained a copy of the Wyeth update, but because Plaintiff was not in his office, Baker directed that Plaintiff's computer be "secured" and that Plaintiff be denied access to Progenics's computer systems.  (Def. 56.1 ¶¶ 85, 87-88; Baker

Dep. 175-79.)  The Parties agree that later that afternoon, upon Baker's direction, Robert

McKinney, then Progenics Chief Financial Officer, located Plaintiff and asked him how he

obtained a copy of the Wyeth Update.  (Def. 56.1 ¶ 90; Pl. 56.1 ¶ 90; Baker Dep. 177, 191-97.)

Plaintiff asked for time to speak to his attorney; McKinney agreed and instructed Plaintiff to

contact Baker with his answer.  (Def. 56.1 ¶¶ 91-92; Pl. 56.1 ¶¶ 91-92; Perez Dep. 170-71; Decl.

of Jonathan Stoler Ex. I ("McKinney Dep.") 32-35.)

On the morning of August 5, 2008, Plaintiff met with McKinney and Baker.  (Def. 56.1

¶ 94; Pl. 56.1 ¶ 94; Perez Dep. 179-82; Baker Dep. 198; McKinney Dep. 52.)  The Parties agree

that the meeting began with Baker giving Plaintiff two letters, each dated August 5, 2008, and

asking Plaintiff to read the letters.  (Def. 56.1 ¶ 95; Pl. 56.1 ¶ 95; Baker Dep. 198-99; McKinney

Dep. 52-53.)  One letter stated that "[t]he allegations made in [the August 4, 2008

Memorandum] are without foundation," (Decl. of Jonathan Stoler Ex. Y (letter dated August 5,

2008); Def. 56.1 ¶ 96; Pl. 56.1 ¶ 96), and the other letter stated that because Plaintiff had

"refuse[d]" to answer McKinney's question as to how he obtained the Wyeth Update, Baker

"reach[ed] the conclusion . . . that [Plaintiff] obtained the document through inappropriate or

illicit means," (Decl. of Jonathan Stoler Ex. Z (letter dated August 5, 2008); Def. 56.1 ¶¶ 98-99;

Pl. 56.1 ¶¶ 98-99).  The Parties also agree that shortly thereafter, at this same meeting, Baker

terminated Plaintiff's employment with Progenics effective immediately.  (Def. 56.1 ¶ 105; Pl.

56.1 ¶ 105; Perez Dep. 181-82; Baker Dep. 157; McKinney Dep. 61-62.)

The Parties disagree about the interaction between Plaintiff and Baker in the time

between Baker giving Plaintiff the letters and Baker firing Plaintiff.  According to Plaintiff,

while reading the letter addressing his access to the Wyeth Update, Plaintiff pointed out that the

statement "You refused to answer" was incorrect, because McKinney had given Plaintiff time to

consult an attorney.  (Pl. 56.1 ¶¶ 103-04; Perez Dep. 181-84.)  Baker then responded that the

meeting was not to discuss this point and told Plaintiff that he was fired.  (Pl. 56.1 ¶¶ 103-04;

Perez Dep. 181-84.)  According to Defendant, after reading the letters, Plaintiff "began to argue

as to whether the press releases were accurate or not."  (Baker Dep. 201.)  Baker testified that he

told Plaintiff that the meeting was not about arguing about the accuracy of the press release, and

asked him where he obtained the Wyeth Update; Plaintiff did not respond.  (*Id.* at 202-04.)

Baker then told Plaintiff, "Unless you tell us how received this document, we're going to have to

terminate you," and Baker fired Plaintiff after Plaintiff did not respond.  (Def. 56.1 ¶¶ 105-06;

Baker Dep. 204-05; McKinney Dep. 60-62.)

Both Parties also cite minutes from a meeting of the Audit Committee of the Board of

Directors for Progenics held on August 5, 2008 to support their versions of events:

> [Baker] informed the Committee that . . . there have been new developments as to
> the status of the individual's employment.  On August 4, 2008, the employee
> submitted a memorandum to Senior Management making claims with regard to
> [Relistor], similar to the claims this individual originally made with regard to
> PSMA.  Attached to this memorandum was a confidential Wyeth document.
> [Baker] stated that he responded to the employee's memorandum citing its
> inaccuracies.  When the employee was questioned as to how he obtained the
> confidential information, he refused to disclose.  The Company consulted with
> outside counsel and determined that it was necessary to terminate the employee as
> it is apparent that he had some access to confidential information.  The employee
> was subsequently terminated on August 5, 2008.

(Decl. of Jonathan Stoler Ex. CC ("Audit Comm. Minutes") 4; Def. 56.1 ¶ 107; Pl. 56.1 ¶ 107.)

B.  Procedural History

On October 2, 2007, Plaintiff filed a complaint with the U.S. Department of Labor/

Occupational Safety and Health Administration ("DOL/OSHA"), alleging that Progenics failed to

promote him in retaliation for raising concerns in October 2005 and October 2006 about a

different drug Prostate-Specific Membrane Antigen Antibody-Drug Conjugate ("PSMA-ADC").

(Def. 56.1 ¶ 110; Pl. 56.1 ¶ 110; Decl. of Jonathan Stoler Ex. DD ("DOL/OSHA Complaint").)

Plaintiff supplemented this complaint on May 13, 2008 to allege retaliation.  (Def. 56.1 ¶ 110; Pl.

56.1 ¶ 110; DOL/OSHA Complaint.)  On September 12, 2008, Plaintiff filed an additional

complaint with DOL/OSHA alleging that Progenics retaliated against him for submitting the

August 4, 2008 Memorandum with respect to Relistor, which Complaint Plaintiff amended on

September 25, 2008.  (Def. 56.1 ¶ 111; Pl. 56.1 ¶ 111; Decl. of Jonathan Stoler Ex. AA (Sept. 12,

2008 Complaint); *id.* Ex. BB (Sept. 25, 2008 Complaint).)  On December 5, 2008, the Secretary

of Labor issued an order dismissing both the PSMA-ADC and Relistor allegations.  (Def. 56.1 ¶

112; Pl. 56.1 ¶ 112; Decl. of Jonathan Stoler Ex. EE (DOL/OSHA Findings).)  On December 23,

2008, Plaintiff objected to the order with respect to its dismissal of the claims related to Relistor

and the August 4, 2008 Memorandum.  (Def. 56.1 ¶ 113; Pl. 56.1 ¶ 113; Decl. of Jonathan Stoler

Ex. FF (Dec. 23, 2008 Objections).)

On September 30, 2010, Plaintiff filed a notice of intent to sue, (Def. 56.1 ¶ 114; Pl. 56.1

¶ 114; Decl. of Jonathan Stoler Ex. GG), and on November 2, 2010, Plaintiff filed a Complaint in

this Court, (Def. 56.1 ¶ 115; Pl. 56.1 ¶ 115; Dkt. No. 1).  On November 29, 2010, Plaintiff filed

the Amended Complaint, which is the operative complaint in this case.[8]  (Def. 56.1 ¶ 116; Pl. 56.1

¶ 116; Decl. of Jonathan Stoler Ex. A; Dkt. No. 6.)  Following discovery, Defendant filed the

instant Motion for Summary Judgment on February 8, 2013, (Dkt. No. 58), Plaintiff responded on

April 5, 2013, (Dkt. No. 68), and Defendant submitted its Reply on April 26, 2013, (Dkt. No. 72).

The Court held oral argument on June 26, 2013.

---

[8]  Although Plaintiff is currently proceeding pro se, the Amended Complaint (and the original Complaint) was filed by an attorney representing Plaintiff.  This same attorney represented Plaintiff during discovery, including the depositions.  Counsel was relieved on his motion.  (Dkt. No. 22.)

<u>II. Discussion</u>

<u>A.  Standard of Review</u>

    1.  Summary Judgment

Summary judgment may be granted where the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).[9]

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also Wrobel v.*

---

    [9]  The Court also notes that where, as here, a party is proceeding pro se, "submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks omitted) (emphasis omitted).

*County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) ("To survive a motion under Rule 56(c), [plaintiff] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial." (internal quotation marks and emphasis omitted)).  A fact is material when "it might affect the outcome of the suit under governing law."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).  Thus, a court's goal should be to "isolate and dispose of factually unsupported claims."  *Celotex*, 477 U.S. at 323-24.

At the summary judgment stage, "it is undoubtedly the duty of district courts not to weigh the credibility of the parties."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Even when a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment, as long as the plaintiff's "testimony was not contradictory or rife with inconsistencies such that it was facially implausible."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (denying summary judgment where defendant's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events"); *Bennett v. Vaccaro*, No. 08-CV-4028, 2011 WL 1900185, at *7–8 (S.D.N.Y. Apr. 11, 2011) (denying summary judgment where defendants did not establish that plaintiff's "testimony is, either on its face or in light of any other statements he has made, so self-contradictory or implausible as to rule out crediting it," and there was no evidence that plaintiff "ever contradicted his current version of [events]").

13

2.  Sarbanes-Oxley

The Sarbanes-Oxley Act provides that publicly traded companies may not

> discharge, demote, suspend, threaten, harass, or in any other manner discriminate
> against an employee in the terms and conditions of employment because of any
> lawful act done by the employee . . . to provide information, cause information to
> be provided, or otherwise assist in an investigation regarding any conduct which
> the employee reasonably believes constitutes a violation of [the fraud provisions of
> Title 18], any rule or regulation of the Securities and Exchange Commission, or
> any provision of Federal law relating to fraud against shareholders, when the
> information or assistance is provided to . . . a person with supervisory authority
> over the employee (or such other person working for the employer who has the
> authority to investigate, discover, or terminate misconduct).

18 U.S.C. § 1514A.  Congress enacted this provision to combat what it identified as a "culture,

supported by law, that discourage[d] employees from reporting fraudulent behavior not only to

the proper authorities . . . but even internally."  S. Rep. No. 107-146, at 5 (2002).

In the Sarbanes-Oxley context, the Second Circuit has identified four elements required

for a prima facie case:

> an employee must prove by a preponderance of the evidence that (1) [he] engaged
> in protected activity; (2) the employer knew that [he] engaged in the protected
> activity; (3) [he] suffered an unfavorable personnel action; and (4) the protected
> activity was a contributing factor in the unfavorable action.

*Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 447-48 (2d Cir. 2013) (quoting

*Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009)) (internal quotation marks

omitted) (fourth alteration in original).  "At the summary judgment stage, a plaintiff need only

demonstrate that a rational factfinder could determine that Plaintiff has made his prima facie

case." *Leshinsky v. Telvent GIT, S.A.*, No. 10-CV-4511, 2013 WL 1811877, at *6 (S.D.N.Y. May

1, 2013).

If a plaintiff successfully makes out a prima facie case, the burden shifts to the defendant,

which must demonstrate that "when, construing all of the facts in the employee's favor, there is

no genuine dispute that the record *clearly and convincingly* demonstrates that the adverse action would have been taken in the absence of the protected behavior."  *See id.* (emphasis in original) (observing that "the defendant's burden . . . is notably more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in Sarbanes-Oxley retaliation cases a more difficult proposition"); *see also Bechtel*, 710 F.3d at 448-49 ("[Plaintiff's] sole burden was to prove, by a preponderance of the evidence, that his protected activity contributed to the adverse employment action.  If he had successfully made such a showing, the burden would then have shifted to [the employer] to prove, by clear and convincing evidence, that it would have taken the same action absent [plaintiff's] protected activity.").

B.  Analysis

Defendant makes three main arguments: (1) Plaintiff did not engage in protected activity, because he did not "reasonably believe" that the May 2008 Press Release was fraudulent; (2) even if Plaintiff engaged in protected activity, Plaintiff cannot show that the protected activity was a "contributing factor" to his termination; and (3) Plaintiff's employment would have been terminated even in the absence of the protected activity.  The Court addresses each argument in turn.

1.  Whether Plaintiff Engaged in Protected Activity

Under the Sarbanes-Oxley Act, a plaintiff's activity is "protected" only if the employee "provide[s] information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders."  18 U.S.C. § 1514A(a)(1); *see also Leshinsky*, 2013 WL 1811877, at *7.

Defendant first argues that Plaintiff did not reasonably believe that Progenics violated the fraud provisions of Title 18, an SEC rule or regulation, or any provision of Federal law related to fraud against shareholders.  (Def. Mem. of Law in Support of its Mot. for SJ ("Def. Mem.") 14-20.)  "To demonstrate that a plaintiff engaged in a protected activity, a plaintiff must show that he 'had both a subjective belief and an objectively reasonable belief that the conduct he complained of constituted a violation of relevant law.'"  *Leshinsky*, 2013 WL 1811877, at *8 (quoting *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir. 2008)); *Barker v. UBS AG ("Barker I")*, No. 09-CV-2084, 2011 WL 283993, at *3 (D. Conn. Jan. 26, 2011) (same); *see also Fraser v. Fiduciary Trust Co. Int'l*, 396 F. App'x 734, 735 (2d Cir. 2010) (affirming district court's grant of summary judgment where "record evidence would not permit a factfinder to conclude that [plaintiff] held both a subjective and objectively reasonable belief that [plaintiff] was reporting conduct covered by [Sarbanes-Oxley]").  "In assessing the reasonableness of a plaintiff's belief regarding the illegality of the particular conduct at issue, courts look to the basis of the knowledge available to a reasonable person in the circumstances with the employee's training and experience."  *Sharkey v. J.P. Morgan Chase & Co.*, No. 10-CV-3824, 2011 WL 135026, at *7 (S.D.N.Y. Jan. 14, 2011) (internal quotation marks omitted); *id.* ("The legislative history of SOX indicates that the reasonableness test is intended to impose the normal reasonable person standard used and interpreted in a wide variety of legal contexts." (internal quotation marks omitted)); *Pardy v. Gray*, No. 07-CV-6324, 2008 WL 2756331, at *5 (S.D.N.Y. July 15, 2008) ("It is sufficient for a plaintiff to show that she reasonably believed, based on the knowledge available to her, considering her training and the circumstances, that her employer was violating the applicable federal law."); *see also Harp*, 558 F.3d at 723 ("Objective reasonableness is evaluated based on

16

the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." (internal quotation marks omitted)).

Defendant claims that Plaintiff's belief was unreasonable, because Plaintiff relied on selective quotations from five Wyeth Update slides and merely "glanced" at the full version of the Wyeth Update before submitting the August 4, 2008 Memorandum.[10]  (Def. Mem. 14-20.) Defendant also argues that the Wyeth Update actually supports the May 20, 2008 Press Release and cites Slide 23 and 25 (statistically significant results for 450 mg dosage), Slide 32 ("rapid and predictable results" on first dose); Slide 34 (a "95% CI for increase in weekly [spontaneous bowel movements] over placebo is 0.0-2.2" for specific doses), and Slide 37 (listing different formulations of Relistor), (Wyeth Update 23, 25, 32, 34, 36-37).  (Def. Mem. 16-20.)

In evaluating Plaintiff's training and experience, it is undisputed that Plaintiff holds a Ph.D. and master's degree in chemistry and worked at Progenics for approximately four years, primarily on chemical formulations of Relistor.  (Def. 56.1 ¶¶ 3-5, 8-9; Pl. 56.1 ¶¶ 3-5, 8-9; Perez Dep. 40-43, 73, 84-87; Pl. Resume.)  Moreover, there is ample evidence that Plaintiff relied on more than just five slides from the Wyeth Update in forming his belief.  In his deposition, Plaintiff explained that he based his opinion, in part, on conversations with Peter Lukacsko and Vivien Wong, other Progenics employees on the Relistor team, in which they discussed "the failed clinical trials," as well as Plaintiff's work on a new salt formulation that he had been directed "urgently" to prepare.  (Perez Dep. 147-154; *see also* Lukacsko Dep. 474-76 (describing conversations with Plaintiff and other employees about the clinical trial results showing that the

---

[10]  Defendant does not contest Plaintiff's subjective belief that the May 2008 Press Release was fraudulent and violated "section 1348 (Securities Fraud), rules and regulations of the [SEC], and provisions of Federal law relating to fraud against shareholders."  (August 4, 2008 Memorandum 2.)

capsule was a failure); Wong Dep. 38 (testifying that it was "possible" that she discussed Relistor

clinical trials with Plaintiff).)  Plaintiff stated that he reviewed "some" of the Wyeth Update slides

"thoroughly," took a "general glance" at other slides, (Perez Dep. 126:25, 127:1-6), and

ultimately chose to attach five slides to his August 4, 2008 Memorandum, "[b]ecause they

summarize the clinical trial results and the formulation work that [Plaintiff] was involved with,"

(*id.* at 125).[11]  In the five slides that he attached to the August 4, 2008 Memorandum, Plaintiff

marked several statements: a statement that "Results from oral Phase 2 studies demonstrated that

neither the tablet nor the capsule formulations had sufficient activity to satisfy the Confirm

advancement criteria"; a chart stating that "efficacy vs. competition" was "not met"; and the

conclusion that it is "[u]nlikely that either formulation will demonstrate consistent and clinically

meaningful effect in Confirm."  (August 4, 2008 Memorandum (marking sections in the Wyeth

Update slides 2, 32, 34).)

      In light of Plaintiff's training, education, and experience, a reasonable jury could find that

it was objectively reasonable for Plaintiff to rely on conversations with colleagues, his review of

the Wyeth Update, as well as his own work to form his belief that the May 22, 2008 Press

Release—which reported "positive activity" and stated that "[w]e are pleased by the preliminary

findings," (May 2008 Press Release)—was "misleading" and not "a true reflection of what [was]

being discussed behind closed doors," (Perez Dep. 130, 136).  *Cf. Mahony v. KeySpan Corp.*, No.

04-CV-554, 2007 WL 805813, at *6 (E.D.N.Y. Mar. 12, 2007) (finding a genuine issue of

material fact where plaintiff relied on his own understanding of "basic accounting principles," a

---

[11]  Defendant argues that Plaintiff may not rely on Lukacsko's deposition testimony,
because it was not known to Plaintiff at the time that he engaged in the protected activity.  (Def.
Reply 4-5.)  However, Lukacsko's deposition testimony arguably corroborates Plaintiff's
testimony that he relied on conversations with colleagues in reaching his conclusion.  (Lukacsko
Dep. 474-76.)

colleague's opinion, and emails to form his belief that defendant was engaging in fraud).  Further,

because Plaintiff does not appear to have any knowledge or training in securities law, a jury could

find that it was reasonable for Plaintiff to conclude that a press release that he found to be

misleading could be securities fraud, or a violation of an SEC rule or regulation or a law relating

to fraud against shareholders.[12]  *See Barker v. UBS AG ("Barker II")*, 888 F. Supp. 2d 291, 299

(D. Conn. 2012) (finding that plaintiff's "education and background" did "not indicate any

particular expertise which would make it objectively unreasonable for [plaintiff] to believe that

[defendant's] failure to properly disclose its exchange assets constituted a violation of securities

regulation"); *see also Ashmore v. CGI Grp. Inc.*, No. 11-CV-8611, 2012 WL 2148899, at *6

(S.D.N.Y. June 12, 2012) (holding that although the plaintiff "may or may not have known what

is required to prevail on a claim of mail or wire fraud . . . , it is not unreasonable for someone

with his background and experience to believe—perhaps correctly—that the use of the telephone

---

[12]  The Court notes that a reasonable person with Plaintiff's training and experience likely would not be familiar with Second Circuit doctrine with respect to the use of "puffery" and "corporate optimism" in press releases.  *See generally Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (affirming dismissal of complaint alleging that a pharmaceutical company's press release violated securities laws and explaining that a statement's veracity is "measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers" and that "words like 'encouraging' are the type of expressions of puffery and corporate optimism that do not generally give rise to securities violations" (internal quotation marks omitted)); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (explaining that subjective statements give rise to liability only where "defendant's opinions were both false and not honestly believed when they were made").  Moreover, it is not necessary that Plaintiff demonstrate that a securities violation actually occurred:  "[A] whistleblower need not show that the corporate defendant committed fraud to prevail in [his] retaliation claim under § 1514A.  The statute only requires the employee to prove that [he] 'reasonably believe[d]' that the defendant's conduct violated federal law."  *Guyden v. Aetna, Inc.*, 544 F.3d 376, 384 (2d Cir. 2008) (second alteration in original); *see also Kramer v. Trans-Lux Corp.*, No. 11-CV-1424, 2012 WL 4444820, at *6 (D. Conn. Sept. 25, 2012) ("[I]n order to obtain the protections of section 1514A, the conduct at issue need not have *actually* constituted a violation of the SEC rules or regulations—by the language of the whistleblower provision, the whistleblower need only have reasonably believed that it was a violation." (emphasis in original)).

lines and email to further a scheme . . . explicitly intended to defraud HUD, constituted mail

and/or wire fraud under federal law"); *cf. Harp*, 558 F.3d at 726 (affirming grant of summary

judgment where plaintiff acknowledged that she did not know if the fraudulent activity she

alleged had actually occurred and where "there was no basis, subjective or objective, for

[plaintiff] to conclude" that the fraudulent activity had occurred); *Harkness v. C-Bass Diamond,

LLC*, No. 08-CV-231, 2010 WL 997101, at *6 (D. Md. Mar. 16, 2010) (granting summary

judgment where plaintiff was a lawyer with twenty years of experience, but failed to conduct any

"legal research to ascertain the applicability of various laws").[13]   Therefore, the Court finds that

Plaintiff has presented sufficient evidence to establish a genuine issue of material fact as to this

element.

> ### 2.  Whether Plaintiff Can Show that the Protected Activity Was a Contributing Factor to His Termination

Defendant's second argument is that Plaintiff cannot show that his protected activity was a

contributing factor to the termination of his employment.  (Def. Mem. 20-22.)  "The words 'a

contributing factor' mean any factor which, alone or in connection with other factors, tends to

affect in any way the outcome of the decision."  *Leshinsky*, 2013 WL 1811877, at *13 (internal

quotation marks omitted); *see also Pardy*, 2008 WL 2756331, at *5 (same) (citing *Marano v.

DOJ*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).  "A plaintiff need not prove that [his] protected

activity was the primary motivating factor in [his] termination, or that the employer's articulated

---

[13]   In support of its Motion, Defendant relies, in part, on *Fraser v. Fiduciary Trust Co. Int'l*, No. 04-CV-6958, 2009 WL 2601389 (S.D.N.Y. Aug. 25, 2009), a case in which the district court held that plaintiff's activities were not protected, because the email and conversation at issue did not express any "specific concern[s]" about illegality and were only "general inquir[ies]." *Id.* at *5-6.  (Def. Mem. 22.)  But here, there is no question that Plaintiff expressed a "specific concern" with respect to the May 22, 2008 Press Release, namely that he believed it contained "false information," which "constitute[d] violations of section 1348 (Securities Fraud), rules and regulations of the [SEC], and provisions of Federal law relating to fraud against shareholders."  (Aug. 4, 2008 Memorandum 2.)

reason was pretext in order to prevail." *Barker II*, 888 F. Supp. 2d at 300; *see also Barker I*, 2011 WL 283993, at *5 (noting that "[t]he contributing factor test is broad and is a relatively low burden for a plaintiff to meet").

      Plaintiff and Defendant have different views as to why Plaintiff was terminated, and each Party cites evidence supporting his/its version of events.  On the one hand, Plaintiff claims that he was terminated because of the August 4, 2008 Memorandum, and that he never "refused" to answer the questions about his access to the Wyeth Update.  There is sufficient evidence to support this theory.  Shortly after Plaintiff submitted the August 4, 2008 Memorandum, but before he was asked by anyone about the Wyeth Update, Plaintiff's computer was removed, and Plaintiff testified that he had a "hostile" encounter with Baker.  (Perez Dep. 166-68.)  Further, according to Plaintiff, McKinney specifically gave him permission to speak with his attorney before responding to the question about Plaintiff's access to the Wyeth Update, (Pl. 56.1 ¶ 91; Perez Dep. 170-71), but on August 5, 2008, Baker fired Plaintiff before Plaintiff could answer the question, (Perez Dep. 182-83).  Additionally, the Audit Committee Minutes can be read to support Plaintiff's argument that Baker had decided to fire him before the meeting on August 5, 2008, because they suggest that the decision was made after a consultation with outside counsel that occurred before the meeting:  "The Company consulted with outside counsel and determined that it was necessary to terminate the employee as it is apparent that he had some access to confidential information.  The employee was *subsequently* terminated on August 5, 2008." (Audit Comm. Minutes 4 (emphasis added).)

      On the other hand, Defendant claims that the termination was the result of Plaintiff's failure to explain how he got the Wyeth Update and characterizes Plaintiff accessing this document as "egregious conduct."  (Def. Mem. 24.)  Defendant relies on Baker's deposition

testimony that he terminated Plaintiff, because "[h]e refused to answer a question [Baker] asked

about a confidential document." (Baker Dep. 157-58.) Baker further explained that his

investigation determined that no Progenics senior executive had provided the document to

Plaintiff, (id. at 173), and that he "concluded by August 5th that [Plaintiff] must've obtained [the

Wyeth Update] through illicit or inappropriate means," (id. at 188). Baker testified that he made

the decision to fire Plaintiff during the August 5, 2008 meeting when Plaintiff refused to answer

Baker's direct question as to how he obtained the Wyeth Update. (Id. at 204-05 ("The next thing

I said to Dr. Perez when I got the blank stare was, 'Unless you tell us how you received this

document, we're going to have to terminate you.' . . . I got another blank stare. . . . I decided to

fire him."); see also Audit Comm. Minutes 4 (explaining that Plaintiff was terminated because he

had access to confidential information).)

Defendant relies on its theory that Plaintiff was terminated because of "insubordination"

for refusing to explain how he obtained the Wyeth Update, and argues that this intervening act

severs any causation from the protected activity.[14] (Def. Mem. 21-22.) However, according to

_____

[14] According to Defendant's account, Baker first learned that Plaintiff had access to the
Wyeth update when Plaintiff submitted the slides with the August 4, 2008 Memorandum.
(Baker Dep. 170-71 (describing how after reading the August 4, 2008 Memorandum, Baker
initiated an investigation as to how Plaintiff was in possession of the Wyeth Update).) Thus, the
instant case is distinguishable from Defendant's cited authority, in which the intervening acts
were unrelated to plaintiff's protected activity. See, e.g., Harp v. Charter Commc'ns, Inc., 558
F.3d 722, 727 (7th Cir. 2009) (intervening event was employer's revenue issues that resulted in
widespread layoffs); Fraser v. Fiduciary Trust Co. Int'l ("Fraser III"), No. 04-CV-6958, 2009
WL 2601389 (S.D.N.Y. Aug. 25, 2009) (granting summary judgment where alleged protected
activity was reporting inaccuracies about an internal document with respect to assets under
management, but "the legitimate intervening basis for [plaintiff's] termination was [defendant's]
determination that [plaintiff] was attempting to establish an unauthorized hedge fund"); Miller v.
Stifel, Nicolaus & Co., Inc., 812 F. Supp. 2d 975, 989 (D. Minn. 2011) (granting summary
judgment where plaintiff was terminated as a result of intervening events, specifically on-going
performance issues and a major customer's complaint about plaintiff's performance). Therefore,
even under Defendant's theory, Plaintiff's submission of August 4, 2008 Memorandum set in
motion the chain of events resulting in his termination, and a reasonable jury could consider the

Plaintiff's testimony, there was no insubordination, because Baker never gave Plaintiff an opportunity to answer the question.  In order to weigh these competing narratives, the Court would have to evaluate the credibility of Plaintiff and Baker, a task outside the Court's domain at the summary judgment stage.  *See Fincher*, 604 F.3d at 726 (denying summary judgment where plaintiff's own account established genuine issue of material fact); *Jeffreys*, 426 F.3d at 554 (explaining that it is not the duty of district courts to weigh credibility at the summary judgment stage).  Therefore, the Court finds that there is a genuine issue of material fact as to the reason for Plaintiff's termination, and, drawing inferences in favor of Plaintiff, a reasonable jury could conclude that Plaintiff's protected activity was a contributing factor to his termination.

### 3.  Whether Plaintiff's Employment Would Have Been Terminated in the Absence of the Protected Activity

Because a jury could find that Plaintiff has established a prima facie case, the burden now shifts to Defendant to demonstrate by clear and convincing evidence that Plaintiff's employment would have been terminated in the absence of his protected activity.  *See Bechtel*, 710 F.3d at 447 ("If the employee establishe[s] these four elements [of the prima facie case], the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." (first alteration in original) (internal quotation marks omitted)); *see also Leshinsky*, 2013 WL 1811877, at *6 (once a plaintiff establishes that a jury could find a prima facie case, "summary judgment is appropriate only when, construing all of the facts in the employee's favor, there is no genuine dispute that the record *clearly and convincingly* demonstrates that the adverse action would have been taken in the absence of the protected behavior" (emphasis in original)); *Mahony*, 2007 WL 805813, at *7

--------------------------------------------------

 protected activity to be a contributing factor to Plaintiff's termination.

23

(noting that "[t]his standard is even more stringent tha[n] the already 'tough standard' that employers face in other employment discrimination cases").

Defendant argues that it would have terminated Plaintiff's employment even in the absence of his protected activity, because Plaintiff "misappropriated the Wyeth Update and refused to explain how he had obtained a copy."[15]  (Def. Mem. 23-25.)  Plaintiff disputes the claim that he "misappropriated" the Wyeth Update and testified that he received the Wyeth Update by interoffice mail, (Perez Dep. 94, 98), that it was distributed widely within Wyeth, (Pl. 56.1 ¶ 68; Decl. of Julio Perez Ex. 13 ("Wyeth Relistor Team email")), and that he often had access to clinical trial results as part of his job duties, (Pl. 56.1 ¶ 69; *see also* Boyd Dep. 393-96 (stating that it was possible that Plaintiff would have access to Phase 2 clinical trial results before August 2008).).  Drawing inferences in the light most favorable to Plaintiff, the Court finds that there is a genuine issue of material fact as to whether Plaintiff "misappropriated" the Wyeth Update at all.  And, the Court has already explained why there is a genuine issue of material fact as to whether Plaintiff actually "refused" to explain his access to the Wyeth Update.

---

[15]  The Court need not address whether Defendant has met its burden when construing the evidence in the light most favorable to Defendant, but simply notes that there is *no* evidence in the record that Defendant knew of or would have discovered Plaintiff's allegedly unauthorized possession of the Wyeth Update *but for* Plaintiff's protected activity, and so it is not clear how the issue of Plaintiff's access would have arisen in the absence of his protected activity. Moreover, the fact that Plaintiff's protected activity and his alleged "misappropriation" of confidential information are one and the same distinguishes this case from Defendant's cited authority.  *See, e.g., In re Riedell v. Verizon Commc'n*, 2006 WL 3246893, at *11 (U.S. Dept. of Labor SAROX) (recommending dismissal of Sarbanes-Oxley complaint for many reasons, including evidence that defendant terminated the complainant for disclosing private information about co-workers months after his alleged protected activity).  *See generally In re Lee v. Parker-Hannifin Corp.*, 2012 WL 759332, at *8 (U.S. Dep't of Labor SAROX) (explaining that in some circumstances, unauthorized acts in furtherance of the purposes of the whistleblower act may be protected and the "balancing of interests to determine whether an employee's unauthorized actions are defensible is . . . simply another way of arriving at a determination of the objective reasonableness of an employee's belief that his actions were protected").

Further, evidence that Defendant removed Plaintiff's computer and that Plaintiff and Baker had a "hostile" encounter prior to any discussion of his access to the Wyeth Update can be considered as evidence that Plaintiff was terminated because of the protected activity. *See Mahony*, 2007 WL 805813, at *6 ("A jury may look to other facts to decide whether the protected activity precipitated the adverse employment action, including evidence of a strained relationship between the parties that portended the employee's termination."); *see also Nichik v. N.Y.C. Transit Auth.*, No. 10-CV-5260, 2013 WL 142372, at *5 (S.D.N.Y. Jan. 11, 2013) (finding, in context of National Transit Systems Security Act complaint, a causal nexus where "the record contains evidence that defendants openly displayed animus towards [plaintiff] because of his [protected activity]"). Moreover, the fact that Plaintiff's employment was terminated less than twenty-four hours after he engaged in the protected activity may be evidence of causation. *See Barker II*, 888 F. Supp. 2d at 300 ("Generally, where a plaintiff relies solely on temporal proximity to establish causation, the amount of time between the employer's knowledge of protected activity and an adverse employment action must be 'very close.'"); *Barker I*, 2011 WL 283993, at *5 ("[C]ourts can consider . . . the amount of time between the protected activity and the adverse employment action, the existence of a strained relationship between the party and the employer, any isolation of the employee from the company, and changed performance evaluations."); *Pardy*, 2008 WL 2756331, at *5 ("One consideration in proving causation is the temporal proximity between the protected activity and the unfavorable personnel decision."). Thus, drawing reasonable inferences in the light most favorable to Plaintiff, the Court finds that Defendant has failed to demonstrate by clear and convincing evidence that it would have terminated Plaintiff even in the absence of his protected activity.

## III. Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment is denied.  The

Clerk of Court is respectfully directed to terminate the pending Motion.  (Dkt. No. 58.)

SO ORDERED.

DATED:        White Plains, New York
              July 24, 2013

                                                    _____
                                                    KENNETH M. KARAS
                                                    UNITED STATES DISTRICT JUDGE

Service List:

Julio Perez
273D South Broadway
Tarrytown, NY 10591
*Pro Se Plaintiff*

Eric David Raphan
Sheppard, Mullin, Richter & Hampton, LLP (NYC)
30 Rockefeller Plaza, 24th Fl.
New York, NY 10112
(212) 634-3045
Fax: (212)-653-8701
Email: eraphan@sheppardmullin.com
*Counsel for Defendant*

Jonathan Stoler
Sheppard, Mullin, Richter & Hampton, LLP (NYC)
30 Rockefeller Plaza, 24th Fl.
New York, NY 10112
(212)-332-3800
Fax: (212) 332-3888
Email: jstoler@sheppardmullin.com
*Counsel for Defendant*