UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JULIO PEREZ,

        Plaintiff,

   -v-

PROGENICS PHARMACEUTICALS, INC.,

        Defendant.

Case No. 10-CV-8278 (KMK)

OPINION AND ORDER

<u>Appearances</u>:

Julio Perez
Tarrytown, NY
*Pro Se Plaintiff*

Eric David Raphan, Esq.
Jonathan Stoler, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

       Plaintiff Julio Perez ("Plaintiff"), proceeding pro se, brings this Action against Defendant Progenics Pharmaceuticals, Inc. ("Defendant"), alleging that Defendant violated the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), 18 U.S.C. § 1514A, by terminating Plaintiff's employment in retaliation for a memorandum he wrote regarding a press release about a pharmaceutical drug. In an Opinion & Order dated July 24, 2013, the Court denied Defendant's Motion for Summary Judgment. Defendant now moves for reconsideration of that Opinion & Order. For the following reasons, Defendant's Motion for Reconsideration is denied.

## I.  BACKGROUND

The Court assumes the Parties' familiarity with the factual and procedural history of this case, as described in *Perez v. Progenics Pharmaceuticals, Inc.*, 965 F. Supp. 2d 353 (S.D.N.Y. 2013).  Accordingly, the Court will summarize the relevant factual and procedural history here only briefly.

### A.  Factual Background

Defendant is a biotechnology company that has been publicly traded on the NASDAQ stock exchange since 1997.  Plaintiff, who holds a Ph.D. and a master's degree in organic chemistry, worked for approximately eleven years as a chemist at two pharmaceutical companies prior to his employment at Defendant, which employment Plaintiff began in May 2004 as Senior Manager of Pharmaceutical Chemistry.  Plaintiff's primary responsibility was to support development of Relistor, a pharmaceutical drug designed to treat patients suffering from postoperative bowel dysfunction or opioid-induced constipation.  Plaintiff's specific responsibilities included working on Relistor's oral, subcutaneous, and intravenous formulations to figure out ways that the oral form of Relistor could be better absorbed by the human body, working on supply of the active pharmaceutical ingredient in Relistor, and supporting activities related to clinical trials, although Plaintiff himself did not perform the clinical trials.

In December 2005, Defendant and another pharmaceutical company, Wyeth Pharmaceuticals Division ("Wyeth"), entered into a License and Co-Development Agreement (the "Progenics-Wyeth Agreement") to co-develop and jointly commercialize Relistor.  Pursuant to the Progenics-Wyeth Agreement, the companies agreed to a Joint Development Plan to govern all aspects of development of the products worldwide.  The Joint Development Plan included draft Target Product Profiles (the "TTP"), representing the technical and commercial targets.

2

According to Defendant, the TPP was merely a wish list and a marketing concept intended to help assess the commercial viability of the drug and its performance against competitive products.  But according to Plaintiff, the TPP was more significant than a wish list, as it specified the labeling concepts that were the goals of the drug development program and documented the specific studies intended to support the labeling concepts.

In order to gain FDA approval for public sales of oral Relistor, Defendant and Wyeth were required to conduct several phases of clinical trials demonstrating its safety and efficacy. Each clinical trial phase had written protocols with primary and secondary endpoints.  From October 2007 until April 2008, the companies conducted a Phase 2 clinical trial on a tablet formulation of oral Relistor (the "2201 Study").  According to the written protocol, the 2201 Study was a hypothesis-generating trial, and the endpoints that would drive decision-making were the proportion of subjects having a spontaneous bowel movement within three hours of the first dose of test article and the proportion of subjects discontinuing prematurely during the first week of active dosing for efficacy and tolerability.  The 2201 Study demonstrated that the tablet formulation of oral Relistor showed statistically significant activity for some dosages, but to date, there has been no Phase 3 clinical trial of this formulation.  Plaintiff claims that the 2201 Study did not show clinically important activity.

On May 22, 2008, Wyeth and Progenics issued a joint press release ("the Joint Press Release"), stating that "a [P]hase 2 trial[] evaluated the effects of an oral formulation of Relistor," which "showed positive activity," and "statistically significant activity as assessed by the occurrence of spontaneous bowel movements and other efficacy measures."  The Joint Press Release also included a quote from the CEO of Progenics at the time, Dr. Paul J. Maddon: "We are pleased by the preliminary findings of this oral formulation."

3

On July 16, 2008, executives in Wyeth's commercial operations and research development groups presented the Relistor Development Strategy Update (the "Wyeth Update") to Wyeth's Executive Development Council.  The Wyeth Update assessed various oral formulations under development, specifically noting that "[r]esults from oral Phase 2 studies demonstrated that neither the tablet nor the capsule formulations had sufficient activity to satisfy the Confirm advancement criteria specified in the approved target product profile."  The Wyeth Update formally recommended that the tablet formulation not advance to Phase 3 clinical trials.  Although some dosages of the tablet formulation demonstrated statistically significant results, and "rapid and predictable results" occurred with the first dose, other targets for the drug were "not met."  According to Defendant, Wyeth decided to engage in further discussions with Defendant and review additional data before making a decision about advancing to Phase 3, but Plaintiff claims that Wyeth endorsed the recommendation not to advance at the July 16, 2008 meeting.

In or around late July 2008, Mark Baker ("Baker"), Defendant's general counsel, received a copy of the Wyeth Update from Dr. Richard Krawiec, another employee of Defendant.  Baker then distributed the Wyeth Update to five members of Defendant's senior management team, not including Plaintiff.  Plaintiff claims that towards the end of July 2008, he received the Wyeth Update via interoffice mail.  Following his receipt of the Wyeth Update, Plaintiff delivered a memorandum ("the August 4, 2008 Memorandum"), entitled "Comments on oral Relistor [P]hase 2 clinical trial results," to Baker and Dr. Thomas Boyd ("Dr. Boyd"), Senior Vice-President of Product Development at Defendant, identifying statements in Joint Press Release.  In the August 4, 2008 Memorandum, Plaintiff wrote: "[Wyeth and Defendant] are committing fraud against shareholders since representations made to the public were not

4

consistent with the actual results of the relevant clinical trial, and [Plaintiff] think[s] this is

illegal." Plaintiff attached three items to the August 4, 2008 Memorandum: selected slides from

the Wyeth Update, the Joint Press Release, and an article entitled "Learn and Confirm," written

by Wyeth managers. For the most part, subsequent events are not relevant to Defendant's

Motion for Reconsideration. Suffice to say that, after several interactions with Baker and Robert

McKinney ("McKinney"), Defendant's CFO at the time, Plaintiff's employment with Defendant

was terminated.

### B.  Procedural Background

Approximately two years after his termination, on November 2, 2010, Plaintiff filed a

Complaint in this Court, (*see* Dkt. No. 1), which he amended on November 29, 2010, (*see* Dkt.

No. 6). In his Amended Complaint, Plaintiff alleges that Defendant violated Sarbanes-Oxley by

firing him in retaliation for the actions that Plaintiff took in regard to the August 4, 2008

Memorandum. (*See* Am. Compl. ¶¶ 66–70.) Plaintiff alleges that those actions constituted

activity protected by Sarbanes-Oxley. (*See id.* ¶¶ 66–67.)

On February 8, 2013, Defendant moved for summary judgment. (*See* Dkt. No. 58.) The

Court heard oral argument on Defendant's Motion on June 26, 2013. (*See* Dkt. (minute entry for

June 26, 2013).) On July 24, 2013, the Court denied Defendant's Motion, rejecting all three of

the arguments that Defendant put forward. (*See* Opinion & Order (July 24, 2013) ("Opinion &

Order") (Dkt. No. 107).) On September 6, 2013, Defendant moved for reconsideration. (*See*

Dkt. No. 111.)

## II.  DISCUSSION

### A.  Standard of Review

"Motions for reconsideration are governed by Federal Rule of Civil Procedure 59(e) and Local Civil Rule 6.3, which are meant to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Pla v. Renaissance Equity Holdings LLC,* No. 12–CV–5268, 2013 WL 3185560, at *1 (S.D.N.Y. June 24, 2013) (internal quotation marks omitted).  "The standard for granting a motion for reconsideration under Local Rule 6.3 is strict, so as to avoid repetitive arguments on issues that have been considered fully by the Court." *Sampson v. Robinson,* No. 07–CV–6890, 2008 WL 4779079, at *1 (S.D.N.Y. Oct. 31, 2008) (internal quotation marks omitted).  Furthermore, a "motion for reconsideration is not an opportunity for a losing party to advance new arguments to supplant those that failed in the prior briefing of the issue." *VR Global Partners, L.P. v. Bennett (In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*), Nos. 06–CV–643, 07–CV–8686, 07–CV–8688, 2008 WL 4962985, at *1 (S.D.N.Y. Nov. 20, 2008).  "Rather, to be entitled to reconsideration, a movant must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion, which, had they been considered might reasonably have altered the result reached by the court." *Id.* (internal quotation marks omitted); *see also Pla,* 2013 WL 3185560, at *1 ("Such a motion is appropriate where the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." (internal quotation marks omitted)).  In other words, "[r]econsideration is appropriate only where there is an intervening change of controlling law,

newly available evidence, or the need to correct a clear error or prevent manifest injustice." *In re Refco,* 2008 WL 4962985, at *1 (internal quotation marks omitted).

B.  Analysis

In its Motion for Reconsideration, Defendant challenges only that part of the Court's Opinion & Order in which the Court rejected the first argument that Defendant made in its Summary Judgment Motion: that Plaintiff did not engage in protected activity, because he did not "reasonably believe" that the Joint Press Release was fraudulent.  (*See* Def.'s Mem. of Law in Supp. of Mot. for Reconsideration ("Def.'s Mem.") 1 ("While [Defendant] respectfully disagrees with the Court's Order in its entirety, [Defendant] does not seek reconsideration of the entire Order.  Rather, [Defendant] submits that the Court committed 'clear error' warranting reconsideration of that portion of the Order wherein the Court found that there was a genuine issue of material fact regarding whether Plaintiff had engaged in protected activity.") (Dkt. No. 113).)  The relevant portion of the Opinion & Order reads as follows:

> Defendant claims that Plaintiff's belief was unreasonable, because Plaintiff relied on selective quotations from five Wyeth Update slides and merely "glanced" at the full version of the Wyeth Update before submitting the August 4, 2008 Memorandum. Defendant also argues that the Wyeth Update actually supports the May 20, 2008 Press Release and cites Slide 23 and 25 (statistically significant results for 450 mg dosage), Slide 32 ("rapid and predictable" results on the first dose); Slide 34 (a "95% CI for increase in weekly spontaneous bowel movement over placebo is 0.0–2.2" for specific doses), and Slide 37 (listing different formulations of Relistor).

> In evaluating Plaintiff's training and experience, it is undisputed that Plaintiff holds a Ph.D. and master's degree in chemistry and worked at Progenics for approximately four years, primarily on chemical formulations of Relistor.  Moreover, there is ample evidence that Plaintiff relied on more than just five slides from the Wyeth Update in forming his belief.  In his deposition, Plaintiff explained that he based his opinion, in part, on conversations with Peter Lukacsko and Vivien Wong, other Progenics employees on the Relistor team, in which they discussed "the failed clinical trials," as well as Plaintiff's work on a new salt formulation that he had been directed "urgently" to prepare.  Plaintiff stated that he reviewed "some" of the Wyeth Update slides "thoroughly," took a "general glance" at other slides, and ultimately chose to

attach five slides to his August 4, 2008 Memorandum, "[b]ecause they summarize the clinical trial results and the formulation work that [Plaintiff] was involved with." In the five slides that he attached to the August 4, 2008 Memorandum, Plaintiff marked several statements: a statement that "Results from oral Phase 2 studies demonstrated that neither the tablet nor the capsule formulations had sufficient activity to satisfy the Confirm advancement criteria"; a chart stating that "efficacy vs. competition" was "not met"; and the conclusion that it is "[u]nlikely that either formulation will demonstrate consistent and clinically meaningful effect in Confirm."

In light of Plaintiff's training, education, and experience, a reasonable jury could find that it was objectively reasonable for Plaintiff to rely on conversations with colleagues, his review of the Wyeth Update, as well as his own work to form his belief that the May 22, 2008 Press Release—which reported "positive activity" and stated that "[w]e are pleased by the preliminary findings"—was "misleading" and not "a true reflection of what [was] being discussed behind closed doors." Further, because Plaintiff does not appear to have any knowledge or training in securities law, a jury could find that it was reasonable for Plaintiff to conclude that a press release that he found to be misleading could be securities fraud, or a violation of an SEC rule or regulation or a law relating to fraud against shareholders. Therefore, the Court finds that Plaintiff has presented sufficient evidence to establish a genuine issue of material fact as to this element.

*Perez*, 965 F. Supp. 2d at 364–66 (citations and footnotes omitted).

Specifically, Defendant "asserts that reconsideration is appropriate here" because "[t]he Court's conclusion in the Order that there is a genuine issue of material fact regarding whether Plaintiff engaged in protected activity was clearly erroneous."  (Def.'s Mem. 5.)  Defendant argues that the Court's conclusion was clearly erroneous for three reasons: "(1) the May 22 Joint Press Release did not contain any material omissions; (2) the Court improperly relied upon Plaintiff's alleged conversations with Mr. Lukacsko and Dr. Wong; and (3) Plaintiff could not have reasonably believed that the press release's reference to 'positive activity' was fraudulent."  (*Id.*)  The Court will address each of these arguments in turn.

<u>1.  Defendant's Omission of Information Regarding Phase 3 Clinical Trials</u>

Defendant's first argument is confusing.  It states that, "[t]hroughout this litigation, Plaintiff has argued that he reasonably believed that the May 22 Joint Press Release was fraudulent because it failed to state whether the Tablet Formulation would be advanced to Phase 3 clinical trials."  (*Id.* at 6.)  But according to Defendant, "omitting this information from the press release fails to establish Plaintiff's reasonable belief because such omission does not satisfy the materiality standard."  (*Id.*)  Which is to say, Plaintiff cannot have formed an objectively reasonable belief that the Joint Press Release was fraudulent based on its failure to state whether the Tablet Formulation would be advanced to Phase 3 clinical trials, because that information was immaterial.

However, as the portion of the Court's Opinion & Order reproduced above makes clear, the Joint Press Release's omission of information regarding Phase 3 clinical trials played no part in the Court's determination that a genuine issue of material fact exists as to whether Plaintiff reasonably believed that the Joint Press Release was fraudulent.  In fact, the Opinion & Order barely discussed Phase 3 clinical trials in any capacity.  In other words, the only relevant holding in the Opinion & Order is that "a reasonable jury could find that it was objectively reasonable for Plaintiff . . . to [have] form[ed] [a] belief" that the Joint Press Release was fraudulent because it "reported 'positive activity' and stated that '[w]e are pleased by the preliminary findings.'" *Perez*, 965 F. Supp. 2d at 365.  The Court never held that a reasonable jury could find that it was objectively reasonable for Plaintiff to have formed a belief that the Joint Press Release was fraudulent because it failed to state whether the Tablet Formulation would be advanced to Phase 3 clinical trials.

The distinction reflected by the Court's holding makes sense.  In the August 4, 2008 Memorandum, Plaintiff never suggested that the Joint Press Release was fraudulent because it *omitted* information; rather, Plaintiff repeatedly directed its recipients' attention to *affirmative representations* contained therein, which representations Plaintiff claimed were fraudulent:

> It is my moral duty to alert both Wyeth and Progenics that with the May 22, 2008 press release both companies are committing fraud against shareholders since *representations made* to the public were not consistent with the actual results of the relevant clinical trial, and I think this is illegal.  I believe that *the false information in* the May 22, 2008 press release constitutes violations of section 1348 (Securities Fraud), rules and regulations of the Securities and Exchange Commission, and provisions of Federal law relating to fraud against shareholders.  *The information presented in* the May 22, 2008 press release is *a fraudulent representation* of the results of the relevant clinical trial of Relistor that impairs shareholders' ability to make an educated decision about the purchase or sale of Wyeth's and Progenics's securities.  Shareholders are being misled about Wyeth's and Progenics's stream of upcoming products.

(Decl. of Jonathan Stoler Ex. X ("August 4, 2008 Mem.") 2 (emphasis added) (Dkt. No. 62).)

Plaintiff specifically identified the affirmative representations to which he was referring:

> [O]n page 1 it says: "This study showed positive activity."  On page 2 it says: "RELISTOR showed statistically significant activity as assessed by the occurrence of spontaneous bowel movements and other efficacy measures."  Also on page 2: "We are pleased by the preliminary findings of this oral formulation."  The rosy picture in the press release is in sharp contrast with the assessment of this same trial in the "Relistor Development Strategy Update," which shows that this formulation had no positive activity, efficacy was not met, and there is no reason to be pleased with this oral formulation that is deemed not worth pursuing further.  As a consequence of this failure new formulations are being explored.

(*Id.* at 1.)  In short, in his August 4, 2008 Memorandum, Plaintiff accused Defendant and Wyeth of making false statements, not refraining from making true ones.

This distinction is also supported by the law.  Sarbanes-Oxley provides, in part, that publicly traded companies may not "discharge . . . an employee . . . because of any lawful act done by the employee . . . to provide information . . . regarding any conduct which the employee

reasonably believes constitutes a violation of [certain laws, rules, and regulations] . . . , when the information . . . is provided to . . . a person with supervisory authority over the employee."  18 U.S.C. § 1514A.  The law thus clearly links the discharge of the employee to the allegedly wrongful conduct about which the employee provided information.  Indeed, to make out a successful Sarbanes-Oxley claim, a plaintiff must "identify *specific conduct* [he] believed to be illegal."  *Yang v. Navigators Grp., Inc.*, — F. Supp. 2d —, 2014 WL 1870802, at *9 (S.D.N.Y. May 8, 2014) (emphasis added); *see also Sharkey v. J.P. Morgan Chase & Co.*, No. 10-CV-3824, 2011 WL 135026, at *6 (S.D.N.Y. Jan. 14, 2011) ("A whistleblower need not cite a code section he believes was violated in his communication to his employer, but the employee's communications must identify the *specific conduct* that the employee believes to be illegal." (emphasis added) (internal quotation marks omitted) (quoting *Welch v. Chao*, 536 F.3d 269, 276 (4th Cir. 2008))); *Fraser v. Fiduciary Trust Co. Int'l*, No. 04-CV-6958, 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009) ("General inquiries do not constitute protected activity.  In order for the whistleblower to be protected by SOX, the reported information must have a *certain degree of specificity*.  A whistleblower must state *particular concerns* which, at the very least, *reasonably identify a respondent's conduct* that the complainant believes to be illegal." (emphasis added) (alterations and internal quotation marks omitted)), *aff'd*, 396 F. App'x 734 (2d Cir. 2010).

Here, Plaintiff was very specific about the conduct of Defendant that he believed to be illegal.  That conduct consisted of affirmative representations of information, not omissions—what he termed "representations made to the public," "false information in the May 22, 2008 press release," "[t]he information presented in the May 22, 2008 press release," and "a fraudulent representation of the results of the relevant clinical trial of Relistor."  (August 4, 2008

11

Mem. 2).  Specifically, he highlighted the following statements: "This study showed positive activity"; "RELISTOR showed statistically significant activity as assessed by the occurrence of spontaneous bowel movements and other efficacy measures"; and "We are pleased by the preliminary findings of this oral formulation."  (*Id.* at 1.)  Plaintiff therefore cannot base his Sarbanes-Oxley claim on the theory that he was terminated in retaliation for providing information about an omission, because he never actually provided any information about an omission.  *Cf. Villanueva v. U.S. Dep't of Labor*, 743 F.3d 103, 110 (5th Cir. 2014) (finding that the petitioner had failed to demonstrate that he engaged in protected activity under Sarbanes-Oxley because "the conduct to which he objected" to his employer "was the supposed orchestration of violations of Colombia tax law, not the violation of U.S. mail or wire laws to effectuate those purported Colombian law violations"); *Portes v. Wyeth Pharm., Inc.*, No. 06-CV-2689, 2007 WL 2363356, at *5 (S.D.N.Y. Aug. 20, 2007) (dismissing a plaintiff's Sarbanes-Oxley claim because "[h]is disclosures to personnel at [his employer] were concerned exclusively with violations of regulations governing the manufacture of pharmaceuticals," not that "the company was violating any federal rule or law related to fraud against shareholders" (emphasis removed) (internal quotation marks omitted)).

All this being said, just because Plaintiff may not proceed on the theory that he reasonably believed that the Joint Press Release was fraudulent because it omitted information about Phase 3 clinical trials, that does not mean that a reasonable jury could not find that Plaintiff formed an objectively reasonable belief that the representations in the Joint Press Release reporting "positive activity" and that Defendant was "pleased by the preliminary findings" were false or misleading in part based on his review of the Wyeth Update's formal recommendation that the tablet formulation of oral Relistor not advance to Phase 3 clinical trials.

If one of the primary purposes of the 2201 Study was to determine whether the tablet formulation of oral Relistor would advance to Phase 3 clinical trials, and the commercial operations and research development groups from Defendant's development partner formally recommended against such advancement based on the 2201 Study's results, and Defendant was aware of that recommendation, then a reasonable person with Plaintiff's training and experience, unfamiliar "with Second Circuit doctrine with respect to the use of 'puffery' and 'corporate optimism' in press releases," *Perez*, 965 F. Supp. 2d at 365 n.12, reasonably might have asked himself: why would Defendant be "pleased"?  While it may not have been reasonable for a person with Plaintiff's training and experience to rely *exclusively* on the Wyeth Update's recommendation to form a belief that the Joint Press Release contained misrepresentations, Plaintiff does not claim to have done so here.  As the Court's Opinion & Order recognized, Plaintiff also claims to have relied on "conversations with colleagues, his review of [other slides contained in] the Wyeth Update, as well as his own work to form his belief," *Perez*, 965 F. Supp. 2d at 365, a subject the Court will address in greater detail below.[1]

Regardless, the Court does not understand Defendant to be requesting reconsideration of its holding that a reasonable jury would be entitled to rely in part on Plaintiff's review of the Wyeth Update's recommendation regarding Phase 3 clinical trials in reaching a determination that Plaintiff's belief that the Joint Press Release contained false or misleading statements was objectively reasonable.  Rather, the Court understands Defendant to be arguing that Plaintiff may

---

[1] To the extent that the Court's devil's advocacy at oral argument suggested that it found Plaintiff's reliance on his review of the Wyeth Update's recommendation in arguing that his belief in the fraudulent nature of the Joint Press Release was reasonable to be unpersuasive, (*see* Def.'s Mem. 6–8), a jury might very well share the Court's skepticism.  But that does not mean that a reasonable jury could not reach the opposite conclusion.  In any event, the Opinion & Order constitutes the Court's decision, not comments it made during a colloquy with Plaintiff.

not proceed on the theory that he reasonably believed the Joint Press Release was fraudulent merely because it omitted information about Phase 3 clinical trials—an argument with which, as discussed above, the Court agrees, albeit on different grounds.[2]  The Court's interpretation of Defendant's argument is based not only on the language Defendant used in its Memorandum of Law.  (*See, e.g.*, Def.'s Mem. i ("The Court's Order was Clearly Erroneous Because the May 22 Joint Press Release did not Contain any Material Omissions"); *id.* at 1–2 ("It is well settled that in order for Plaintiff to rely upon an omission to establish his objectively reasonable belief that Progenics intentionally omitted certain facts from the press release, such omission must be *material*."); *id.* at 5 ("the May 22 Joint Press Release did not contain any material omissions"); *id.* at 6 ("[O]mitting . . . information [regarding whether the tablet formulation would be advanced to Phase 3 clinical trials] from the press release fails to establish Plaintiff's reasonable belief because such omission does not satisfy the materiality standard referenced above."); *id.* at 10 ("[T]he fact that the May 22 Joint Press Release did not mention whether the Tablet Formulation would advance to Phase 3 clinical trials is not a material omission.  Thus, as a matter of law, Plaintiff cannot rely upon such omission to establish his reasonable belief.");

---

[2] Defendant's principal argument appears to be that Plaintiff cannot base his claim on Defendant's omission of information regarding Phase 3 clinical trials, because such omission was immaterial.  The Court does not reach the materiality question, because it determines that Plaintiff never provided information to Defendant about any such omission, and therefore cannot have been terminated in retaliation therefor.  Although it is not the main thrust of Defendant's Memorandum of Law, Defendant does address this point therein, though briefly and somewhat elliptically.  (*See* Def.'s Mem. 8–9 ("Plaintiff's August 4 Memo mentions nowhere anything about advancing the Tablet Formulation, or not, to Phase 3 trials. . . .  Accordingly, Plaintiff's belated attempt to save his claim by raising new concerns about the May 22 Joint Press Release—concerns which Plaintiff failed to raise in his original August 4 Memo—should be disregarded by the Court and further establish that this alleged omission is immaterial.").)  Defendant also included a lengthier version of this argument in the Reply Memorandum of Law that it submitted in support of its Summary Judgment Motion.  (*See* Def.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. 1, 3–4.)

Def.'s Reply Mem. of Law in Supp. of Mot. for Reconsideration ("Def.'s Reply Mem.") 4 ("The Court's Order was Clearly Erroneous Because the May 22 Joint Press Release Did Not Contain Any Material Omissions").)  It is also based on the Defendant's inclusion in its Memorandum of Law of large segments of the transcript from oral argument, in which the Court primarily discussed with Plaintiff weaknesses in his argument that Defendant's failure to mention Phase 3 clinical trials in the Joint Press Release was a material omission.  (*See, e.g.*, Def.'s Mem. 6 ("MR. PEREZ: It's—Your Honor, it's, it's a matter of material omissions . . . .  THE COURT: Okay, but it's—if something is material, and when you talk about a material omission, it's because it might—it means that there is information that, for example, in this case, an investor, a reasonable investor would want to know, that would put into context the statement to determine whether or not the statement is true.  If the press release doesn't mention advancement criteria to Phase 3, then the omission of data regarding advancement to Phase 3 would not be material." (emphasis removed)); *id.* at 8 ("MR. PEREZ: Yes.  The reason why that is a material omission is that in previous press releases it had been done correctly for this particular oral Relistor. . . . THE COURT: Okay.  Fair enough.  But if the press release doesn't mention Phase 3, then the omission of information about whether it satisfies the criteria for Phase 3, I'm still at a loss to understand how it's a material omission." (emphasis removed)); *id.* ("THE COURT: Okay. When they want to give a press release about Phase 3 criteria, you're right, they can't omit material information.  But if they don't address whether or not the criteria have been met, the omission of whether or not the criteria have been met, it seems to me, you have a harder argument that that's a material omission.  That's exactly what Lukacsko is saying here, is it doesn't address.  It's not complete, but that doesn't mean that the omission is material." (emphasis removed).)

As stated previously, the Court's Opinion & Order never embraced Plaintiff's argument that he could have had a reasonable belief that the Joint Press Release was fraudulent because it omitted information regarding Phase 3 clinical trials.  The Opinion & Order focused on alleged misrepresentations, not alleged omissions.  It is thus unsurprising that in the section of its Memorandum of Law addressing the omission issue, Defendant does not cite to the Opinion & Order even once.  (*See* Def.'s Mem. 5–10.)  If Defendant was seeking clarification that, should this matter proceed to trial, it will do so only on the theory that a reasonable jury could find that Plaintiff reasonably believed that the Joint Press Release was fraudulent because of alleged misrepresentations contained therein, not omissions of information therefrom, the instant Opinion & Order should serve that function.  But in regard to the first Opinion & Order, on this point, there is simply nothing to reconsider.[3]

---

[3] It appears as though Defendant may also be attempting to argue in its Reply Memorandum of Law that the Court should reconsider its Opinion & Order because the *affirmative representations* in the Joint Press Release that Plaintiff identified were "immaterial." (*See* Def.'s Reply Mem. 7 ("Finally, and most significantly, the *immateriality* of the statements set forth in the May 22 Joint Press Release is further supported by Plaintiff himself, who admits in his Opposition that such statements were nothing more than 'vague' assertions that 'convey[ed] no substance.'  Even he must concede—and has conceded—that the statements in the May 22 Joint Press Release were immaterial." (citation omitted)).)  This argument's appearance in Defendant's submissions is disappointing.  First, Defendant never raised this argument in connection with its original Motion for Summary Judgment, (*see* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. (Dkt. No. 63)), and as such, it may not do so now.  *See In re 650 Fifth Ave. & Related Properties*, No. 08-CV-10934, 2014 WL 3744404, at *1 (S.D.N.Y. July 28, 2014) ("[M]otions for reconsideration cannot be based on new arguments that were not properly raised." (citing *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).  Second, an argument could certainly be made that a company's press release stating that a drug it was developing showed "positive" and "statistically significant activity" in a clinical trial, and that the company was "pleased by the preliminary findings" related to that drug, would be the type of information upon which the company's investors might rely.  *Cf. Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 614 (S.D.N.Y. 2008) ("[A] plaintiff satisfies the materiality requirement by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." (alterations and internal quotation marks omitted)).  Regardless, Defendant has not made the contrary argument, nor did it do so at the

2.  Plaintiff's Conversations with Mr. Lukacsko and Dr. Wong

Defendant next argues that "[t]he Order was also clearly erroneous because the Court mischaracterized the record with respect to Plaintiff's alleged conversations with Mr. Lukacsko and Dr. Wong to reach its conclusion that Plaintiff engaged in protected activity."  (Def.'s Mem. 10.)  First, "[w]ith respect to Mr. Lukacsko, Plaintiff *admitted* at oral argument the record is devoid of *any* evidence that he relied upon his alleged conversations with Mr. Lukacsko to form his purported reasonable belief."  (*Id.*)  In support of this argument, Defendant cites to the following passage from the oral-argument transcript:

> THE COURT: Moreover, where is it in the record that your letter—your August 4th memorandum was based on what Lukacsko told you?
>
> MR. PEREZ: Oh, no, it doesn't say that.  It only says—
>
> THE COURT: Okay.  So—so, whatever Lukacsko's opinion was about the accuracy or the fairness of the press release, what['s] that got to do with whether you had a good faith basis, a reasonable basis to submit your memorandum if he didn't share these views with you before you wrote it?
>
> MR. PEREZ: Well, it shows that I had reasonable belief on reviewing the press release and the Wyeth update—
>
> THE COURT: But it doesn't show that.  It shows what his opinion was, but he based

---

summary-judgment stage.  Third, the Court notes that at least one court within the Second Circuit has held that "the Sarbanes-Oxley Act does not contain an independent materiality requirement.  As such, the plaintiff does not need to prove the fraud was actually material, but rather only that she held an objectively reasonable belief that it was."  *Barker v. UBS AG*, No. 09-CV-2084, 2011 WL 283993, at *4 (D. Conn. Jan. 26, 2011) (citation omitted) (citing *Welch*, 536 F.3d at 276); *see also Wiest v. Lynch*, 710 F.3d 121, 133 (3d Cir. 2013) (finding that the district court "erred by requiring that an employee's communication reveal the elements of securities fraud, including . . . materiality," in an action brought pursuant to Section 806 of Sarbanes-Oxley).  Thus, even if Defendant could establish that the statements in the Joint Press Release were in fact "immaterial," perhaps because they could be considered mere puffery or corporate optimism, Defendant would still have to show that a reasonable jury could not find that Plaintiff could have reasonably believed that such statements were material to prevail on summary judgment.  Defendant has not made this argument at any stage of this litigation.

> his opinion perhaps on different information than you based yours on.  I mean, if you looked at only five slides and you glanced at the rest of this Wyeth document, that may be very different than what Lukacsko based his answers in the deposition on.

(Def.'s Mem. 10–11 (citing Hr'g Tr. 38–39).)

It is unclear exactly what Plaintiff meant when he responded to the Court's first question by stating, "Oh, no, *it* doesn't say that."  (*Id.* at 10 (emphasis added) (citing Hr'g Tr. 38).)  His use of "it" may have been a reference to the record—or, it may have been a reference to the August 4, 2008 Memorandum, in which case his acknowledgment that the document did not state that it was based on what Mr. Lukacsko told him would be irrelevant.  Regardless, it seems unlikely that this Court would be permitted to treat as evidence unsworn statements that Plaintiff made at oral argument, especially given Plaintiff's status as a pro se litigant to whom special solicitude is due.  *Cf. Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[M]ere conclusory allegations or denials in . . . oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." (internal quotation marks omitted)); *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, — F. Supp. 2d —, 2014 WL 812820, at *22 n.36 (S.D.N.Y. Mar. 3, 2014) (noting the lack of any "evidence in the record" supporting one of the party's allegations, "other than counsel's conclusory assertions at oral argument, which of course is not evidence"); *Decrosta v. Nat. Post Office Mail Handlers*, Nos. 90-CV-585, 90-CV-1269, 1994 WL 173825, at *6 (N.D.N.Y. May 4, 1994) (holding that the plaintiff's "conclusory assertions at oral argument" did not raise a genuine issue of material fact as to a disputed issue).[4]

---

[4] Although courts sometimes rely on the unsworn testimony of pro se litigants in deciding motions, they appear to take this course of action when to do so would inure to a pro se litigant's benefit, in keeping with liberal construction afforded to pro se pleadings.  *See Robert Small Inc. v. Hamilton*, No. 09-CV-7171, 2010 WL 2541177, at *2 n.1 (S.D.N.Y. June 10, 2010)

By contrast, Plaintiff's deposition testimony is undoubtedly evidence. As the Court noted in the Opinion & Order, *see Perez*, 965 F. Supp. 2d at 364, the following statements appear therein:

Q: . . . With respect to the May 22, 2008 press release and your concerns with that press release, did you ask to speak with Dr. Boyd or Mark Baker prior to drafting your August 4, 2008 memo?

A: No.

Q: Did you have any meetings with any Progenics employee after you received Respondent's 12 . . . regarding the May 22, 2008 press release?

A: Yes.

Q: Who?

A: Peter Lukacsko.

Q: Okay. And what did you talk about with Peter Lukacsko?
. . .

A: About the failed clinical trials.

Q: What did you say to him specifically?

A: Oh, he came up to me and told me there had been a meeting with, a conference with Wyeth that day and they had discussed the results of the phase 2 clinical trials and neither formulation was going to advance to phase 3 and that it was, that there was more formulation work in progress.

Q: What else did he say?

A: Well, he went in some, he gave me some details about clinical trial results, that one of the formulations was worse than the other.

Q: Did he say which formulation was worse than the other?

---

(collecting cases); *see also Terio v. Carlin*, No. 10-CV-3201, 2010 WL 4117434, at *1 n.1 (S.D.N.Y. Sept. 27, 2010) (considering the plaintiff's "statements at oral argument in deciphering [the] [p]laintiff's claims"), *adopted by* 2010 WL 4117377.

A: Yes, he said "The capsule didn't do squat," those were his exact words.

Q: What else did he say?

A: He said there was, for the tablets there was some, it showed some activity, but not enough to advance to phase 3.

Q: Okay.  And when did you have this conversation with Mr. Lukacsko?

A: Around July 17 . . . .

(Decl. of Jonathan Stoler Ex. C. ("Pl.'s Dep. Tr.") 146–48 (Dkt. No. 62).)

Thus, contrary to Defendant's claim, and its characterization of Plaintiff's statement at oral argument, there is evidence in the record suggesting that Plaintiff "relied upon his alleged conversations with Mr. Lukacsko to form his purported reasonable belief."  The Court will not discount this evidence in deciding Defendant's Summary Judgment Motion simply based on a single comment of dubious clarity that Plaintiff made at oral argument.

Defendant also argues that, "even if Plaintiff were to now allege that he relied upon his conversations with Mr. Lukacsko to form his alleged reasonable belief, such fact is still insufficient to warrant a denial of [Defendant's] Motion," because Mr. Lukacsko testified at his deposition that "there is nothing in the May 22 Joint Press Release that is inaccurate"; that "he probably did not use the word 'failed' when discussing the Tablet formulation with Plaintiff because '[f]ailed' usually implies that there was no statistical efficacy," and "[i]n this particular case, the whole study was not a dud"; and that "even if he used the word 'failed' he would have 'corrected himself' and 'clarified' his comments."  (Def.'s Mem. 11 (alterations and some internal quotation marks omitted).)

In the first instance, Mr. Lukacsko's testimony that he "probably" did not use the word "failed"—to the extent that is an accurate characterization of his testimony—is hardly a smoking

gun.  In fact, Mr. Lukacsko's actual testimony renders Plaintiff's description of their interaction far more plausible than Defendant's characterization suggests:

> Q: . . . With respect to discussions you had with Dr. Perez and others at Progenics regarding the oral RELISTOR Phase 2 clinical trials—and I'm referring to discussions after the press release of May of '08; okay? — you said you may not have used the word "failed" to describe those clinical trial results; is that correct?
>
> A: Right.
>
> Q: You also said, though, you might've used that word but then clarified it with the particulars; correct?
>
> A: I might have used that word, but I usually don't use the word "failed."
>
> Q: Okay.  But you might've used it?
>
> A: I might've used it.
>
> Q: And if you did, you would have then explained what you meant; correct?
>
> A: Correct.
>
> Q: So, if Dr. Perez recalls you using that word, you don't have any basis to deny using it, do you? The word, "failed."
> . . .
>
> A: I can't deny that I did not use that word, because it's a long time ago, and I don't always remember what I said a long time ago.  However, based on my experience . . . "failed" usually implies that there was no statistical efficacy; the whole study was a dud.  In this particular case, the whole study was not a dud, okay?  It was not as robust.  So, I would be surprised if I had used that word, but I can't deny that I didn't use the word; because actually, I don't remember.
> . . .
>
> Q: Okay.  And you also said today—not in describing conversations that you had with Dr. Perez, but just in describing the results, themselves—you said, everybody knew Phase 2 studies failed.  You used that term today, and then went on to say, well, let me explain what I meant by that; correct?
>
> A: I probably did, yes.
>
> Q: That happened today in your testimony when you were questioned . . . .

A: Okay.

. . .

Q: Okay.  The same thing could have happened back in 2008 in discussions with Mr. Perez and others; correct?

A: It could've happened.

(Peter Lukacsko Dep. Tr. 474–77.)[5]

In any event, even assuming that Mr. Lukacsko's testimony undermines Plaintiff's version of events, Defendant's attempted use of that testimony essentially amounts to an argument that Mr. Lukacsko's recollection of the conversation that he had with Plaintiff should control, not Plaintiff's recollection of the same event.  (*See* Def.'s Mem. 11 ("Stated simply, it belies logic and commonsense that Plaintiff could somehow establish a reasonable belief that the May 22 Joint Press Release was fraudulent based upon a conversation he had with an individual who firmly believes that the press release is entirely accurate.").)  But "[i]t is well-settled that on a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried." *Berrezueta v. Royal Crown Pastry Shop, Inc.*, No. 12-CV-4380, 2014 WL 3734489, at *3 (E.D.N.Y. July 28, 2014) (alterations and internal quotation marks omitted) (quoting *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).  If this matter proceeds to trial, a jury could certainly find that Mr. Lukacsko's testimony was more credible than Plaintiff's; but it could also find the opposite.  But either way, that determination is a matter for a jury, not the Court.

---

[5] The Court cites to the copy of Mr. Lukacscko's deposition transcript that it has in its possession instead of the exhibits that Defendant submitted in support of its Motion for Summary Judgment because those exhibits did not contain most of the pages of Mr. Lukacsko's deposition transcript discussed above.

"With respect to Dr. Wong," Defendant argues that "Plaintiff conceded at his deposition that he never discussed the Wyeth Report with Dr. Wong and that he never directly discussed the May 22 Joint Press Release or his concerns regarding the same with Dr. Wong." (Def.'s Mem. 12.) Instead, "the only conversation Plaintiff had with Dr. Wong was a conversation during which Dr. Wong allegedly told Plaintiff that Wyeth was interested in having Plaintiff prepare certain salts immediately," which conversation "Plaintiff admits . . . was, at best, an 'indirect' conversation about the May 22 Joint Press Release." (*Id.*)

The Court was aware at the time it issued the Opinion & Order of the precise nature of Plaintiff's testimony regarding the conversation with Dr. Wong on which he allegedly relied in forming his belief—in fact, the Court cited to the specific pages of the transcript from Plaintiff's deposition in which his description of that conversation appears. *See Perez*, 965 F. Supp. 2d at 364 (citing Pl.'s Dep. Tr. 147–54.) In his deposition, Plaintiff described that conversation as follows:

> Q: Did you have any conversations with Miss Wong regarding the May 22 press release and your concerns about it?
>
> A: Indirectly there was a discussion about that Wyeth was interested in the SLS salt of MNTX and they also wanted me to prepare other salts for Wyeth urgently, so it was related to the press release and to the clinical trial results.
>
> Q: The SLS salts that you're talking about is in connection with creating new formulations of the oral form of RELISTOR, correct?
>
> A: Yes.

(Pl.'s Dep. Tr. 153–54.)

It appears from this testimony as though Plaintiff may have understood Wyeth's urgent need for other salts to be an indication that the current version of oral Relistor—the version that was the subject of the Phase 2 clinical trials—was in some way deficient. (*See also* Pl.'s Opp. to

23

Def.'s Mot. for Reconsideration ("Pl.'s Opp.") 8–9 ("Around May 2008, Wyeth asked us if we

could spare some 'zwiterrion,' a convenient material for the preparation of Relistor salts.  I had

used zwitterion at Progenics exclusively to make Relistor salts.  I sent Wong, my immediate

supervisor, an email saying about 50 grams of zwitterion were available.  The renewed interest

in this material was unanticipated.  It did not make sense unless additional formulation work was

to be conducted.  There was no other obvious use for it.  Wyeth asked Progenics for the Relistor

tartrate salt . . . .  I was told by Wong that Wyeth wanted this prepared urgently. . . .  Wong and I

discussed: (1) The additional formulation work underway; and (2) Wyeth moving forward with

the Relistor MOA-SLS salt.  We made a comment to the effect that the good news was that

Wyeth was not giving up on oral Relistor after three failed formulations.").)  It was exactly for

this reason that the Court cited to this portion of Plaintiff's deposition transcript in the Opinion

& Order.  It was one data point among many on which Plaintiff claims to have relied in forming

his belief.  Defendant's argument does not call the Court's citation to this portion of Plaintiff's

deposition transcript into question in any way.

Defendant also argues that, although "[t]he Court cited to Dr. Wong's deposition

testimony (Wong 38) in support of its conclusion that Plaintiff engaged in protected activity,"

"Dr. Wong did not testify in this portion of her transcript that she possibly discussed the

RELISTOR clinical trials with Plaintiff," but instead "merely testified that she possibly

discussed Plaintiff's work in support of oral RELISTOR or oral MNTX."  (Def.'s Mem. 12.)  In

the Opinion & Order, the Court stated the following on this subject:

> In his deposition, Plaintiff explained that he based his opinion, in part, on
> conversations with Peter Lukacsko and Vivien Wong, other Progenics employees on
> the Relistor team, in which they discussed "the failed clinical trials," as well as
> Plaintiff's work on a new salt formulation that he had been directed "urgently" to
> prepare.  (Perez Dep. 147–154; *see also* Lukacsko Dep. 474–76 (describing

conversation with Plaintiff and other employees about the clinical trial results showing that the capsule was a failure); Wong Dep. 38 (testifying that it was "possible" that she discussed Relistor clinical trials with Plaintiff.)

*Perez*, 965 F. Supp. 2d at 364.

Defendant is correct that, instead of parenthetically describing Dr. Wong as "testifying that it was 'possible' that she discussed Relistor clinical trials with Plaintiff," the Court likely should have written something along the lines of, "testifying that it was 'possible' that she discussed Plaintiff's work in support of oral RELISTOR or oral MNTX," which would have been more precise. (*See* Vivien Wong Dep. Tr. 38.)[6]  But changing the parenthetical description of Dr. Wong's testimony would not have altered the Court's conclusion in the Opinion & Order in any way.  Plaintiff testified that he discussed Wyeth's interest in his preparing other salts urgently with Dr. Wong.  Dr. Wong testified that it was possible that she discussed Plaintiff's work in support of oral Relistor with Plaintiff—which discussion presumably could have encompassed Wyeth's interest in his preparing other salts urgently.  Plaintiff's and Dr. Wong's statements are not inconsistent.  And even if they were, it is not the Court's role at summary judgment to pit two parties' depositions against one another to see which one comes out on top. In short, Defendant's arguments related to Dr. Wong's testimony suffer from the same deficiencies as do its arguments related to that of Mr. Lukacsko.  *See Berrezueta*, 2014 WL 3734489, at *3.

### 3.  "Positive Activity"

Lastly, Defendant argues that "the Order was clearly erroneous because the May 22 Joint Press Release's statement that the Tablet formulation showed 'positive activity' is insufficient to

---

[6] *See supra* note 5.

establish Plaintiff's reasonable belief," because Plaintiff has "wholly undermined this argument when he conceded during his deposition that the Tablet Formulation did, in fact, show positive activity during the 2201 Study." (Def.'s Mem. 12.)  Defendant also states that, although "Plaintiff later tried to qualify his admission by stating that the use of the phrase 'positive activity' was accurate only in 'isolation,'" that qualification was ineffectual, as "the fact that the press release did not further state whether the Tablet Formulation would advance to Phase 3 clinical testing was not a material omission." (*Id.* at 12–13.)

Defendant is referring to the following testimony from Plaintiff's deposition:

Q: . . . This is a press release issued by Progenics dated July 20, 2007. . . .  And can you read the last sentence in the first paragraph of the press release?  Read it aloud. . . .

A: "The latest data showed positive activity (as assessed by the occurrence of a bowel movement) in patients receiving the higher of two doses tested of the new oral formulation."

Q: Now, in this press release would you agree that the term "positive activity" is defined as the occurrence of a bowel movement?

A: Yes.

Q: And in the 2201 studies that we reviewed earlier you agreed that there were examples of bowel movements occurring in test subjects, correct?

A: Yes.

Q: Now looking at the May 22, 2008 press release . . . . . . .

A: Yes.

Q: Page 1 of the press release, second paragraph, last sentence in the second paragraph, it reads, "This study showed positive activity."  Do you see that?

A: Yes.

Q: And the study that is being referred to is the 2201 study, correct?

A: Yes.

Q: So based on what we've just discussed, you would agree, would you not, that the term "positive activity" is a true statement in the press release, correct?

A: In isolation it is.

(Pl.'s Dep. Tr. 139–41.)

The Court does not understand Defendant's characterization of Plaintiff's deposition testimony. Rather than an admission, followed by an attempted qualification, it appears as though the only statement that Plaintiff made that could be fairly described as either an admission or a qualification is his statement, "In isolation it is."[7] The Court fails to see how this single statement "wholly undermined" Plaintiff's argument that the Joint Press Release was fraudulent in part because it contained a statement that the oral formulation of Relistor "showed positive activity."

Further, Plaintiff did not explicitly tie the qualification in his deposition testimony to any alleged material omission from the Joint Press Release. Plaintiff's testimony that the "positive activity" statement was accurate only "in isolation" could be explained by a number of other rationales. For example, Plaintiff could have meant that, if the Joint Press Release had stated only that the oral formulation of Relistor "showed positive activity," that statement would not have been misleading. But by adding the statement that Defendant was "pleased" by the Phase 2 clinical trial, the meaning of the statement that the oral formulation of Relistor "showed positive activity" was altered, such that it suggested that the oral formulation of Relistor showed *only* positive activity.

---

[7] Defendant may have confused Plaintiff's deposition testimony regarding Defendant's July 20, 2007 press release with his testimony regarding the Joint Press Release.

In short, the Court does not interpret the portion of Plaintiff's testimony that Defendant emphasizes—which consists of a single phrase susceptible to multiple possible meanings—as a "concession" that it was not objectively reasonable for him to believe that the Joint Press Release was fraudulent in part because it contained the "positive activity" statement. As such, Plaintiff's third argument fails.

### III.  CONCLUSION

For the reasons given herein, Defendant's Motion for Reconsideration is denied with prejudice.  The Clerk is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 111.)

SO ORDERED.

Dated:      September __8__, 2014
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE