UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
JULIO PEREZ,                       :
                                   :
               Plaintiff,          :        10-CV-08278 (LAP)
                                   :
     -against-                     :        OPINION
                                   :
PROGENICS PHARMACEUTICALS, INC.,   :
                                   :
               Defendant.          :
----------------------------------x

Contents

I. Statement of the Case ........................................................3

    A. Factual Background ....................................................3

    B. Procedural History ....................................................6

    C. Trial .........................................................................9

II. Plaintiff's Motions .......................................................37

    A. Motion for Prejudgment Interest .............................37

        1. Interest Percentage .........................................38

        2. Interest Time ..................................................41

        3. Calculation ....................................................43

        4. Conclusion .....................................................46

    B. Motion for Reinstatement .........................................46

        1. Feasibility .....................................................46

        2. Front Pay .......................................................49

        3. Conclusion .....................................................52

    D. Attorney's fees ........................................................52

III. Defendant's Motion ......................................................56

    A. New Trial ................................................................57

        1. Testimony on Omissions from the May 2008 Press Release ........59

        2. Testimony on Facts Unknown to Defendant on August 4 ...............62

        3. The Wyeth Update Email (Exhibit 35) ........................64

        4. Late Submission of Job-Search Mitigation Evidence ...................68

5. Denial of Defendant's Proffered Evidence.................................................74

6. Plaintiff's Prior Consistent Statement Evidence.......................75

7. Conclusion..............................................................................................76

B. Remittitur ...................................................................................................81

1. Failure to Mitigate..............................................................................82

2. Damages Calculation.........................................................................84

3. Trial Delay.............................................................................................87

IV. CONCLUSION ...............................................................................................88

LORETTA A. PRESKA, United States District Judge:

The parties conducted a jury trial which resulted in a judgment in favor of the Plaintiff in the amount of $1,662,951.00.  (See Jury Verdict Form at ¶¶ 1-3, Aug. 5, 2015, ECF No. 240.)  Now before the Court are Plaintiff's Motion for Prejudgment Interest (see Pl.'s Notice of Mot. for Prejudgment Int., Aug. 31, 2015, ECF No. 257), Plaintiff's Motion for Reinstatement (see Pl.'s Notice of Mot. for Pl.'s Reinstatement, Aug. 31, 2015, ECF No. 259), Plaintiff's former attorneys' Motion for Attorney's Fees (see Mot. for Attorneys' Fees, Aug. 31, 2015, ECF No. 262), and Defendant's Motion for a New Trial or in the Alternative for Remittitur (see Notice of Def.'s Mot. for a New Trial or in the Alternative for Remittitur, Sept. 10, 2015, ECF No. 265-67).

## I. Statement of the Case

### A.   Factual Background

Plaintiff Dr. Julio Perez, Ph.D., ("Plaintiff" or "Dr. Perez") was previously employed by Defendant Progenics Pharmaceuticals, Inc. ("Defendant" or "Progenics") up to and including 2008.  In that year, Progenics, with its partner, Wyeth Pharmaceuticals ("Wyeth") conducted clinical trials for a drug called Relistor.  Relistor was intended to alleviate constipation in patients undergoing cancer treatments.  In order

to obtain Food and Drug Administration ("FDA") approval for Relistor, Progenics and Wyeth were required to put it through three phrases of clinical trials.

In spring 2008, Progenics and Wyeth completed the second phase of Relistor's clinical trials.  In May 2008, Progenics issued a press release indicating that it was "pleased" with the second-phase results, which had shown "statistically significant activity."  (See Def.'s Ex. V, Wyeth and Progenics Announce Preliminary Clinical Trial Results for Relistor Oral and Intravenous Formulations ("May 2008 press release") 2, May 22, 2008, ECF No. 62-22.)  At this time, Dr. Perez was involved as a chemist working on the oral formulation of Relistor and was aware of the press release but had not reviewed the clinical trial results.

Sometime in July 2008, Dr. Perez reviewed a document known as the "Wyeth Update," a PowerPoint slide presentation in which Wyeth's employees summarized the second-phase trial results for Relistor.  The Wyeth Update indicated that although the Relistor trial had shown some statistically significant activity, the drug had not achieved advancement criteria set out by Wyeth. The Update recommended against proceeding to the third phase of clinical trials.  (See Def.'s Ex. W, Wyeth Pharm. Relistor Dev. Strategy Update ("Wyeth Update") 2, July 16, 2008, ECF No. 62-23.)

After reviewing the Wyeth Update, Dr. Perez drafted a memorandum dated August 4, 2008, addressed to Progenics' general counsel and to the head of Plaintiff's department, accusing the company of committing fraud on shareholders by publishing the May 2008 press release. After pointing out what he interpreted to be contrasts between the "rosy picture in the [May 2008] press release" and the results described in the Wyeth Update, Dr. Perez described it as his "moral duty" to advise both companies that they "were committing fraud against shareholders." (See Def.'s Ex. X, Memorandum ("August 4, 2008 memorandum") 1-2, Aug. 4, 2008, ECF No. 62-24.)

On the same day that Dr. Perez delivered his memo, Progenics' employees removed Dr. Perez's computer from his office and disabled his access to Progenics' information technology system. That afternoon, Robert McKinney, Progenics' Chief Financial Officer, questioned Dr. Perez as to how he came to possess the Wyeth Update, and Dr. Perez responded by asking to speak with his attorney. Mr. McKinney told Dr. Perez that he "couldn't stop him" from speaking to his attorney. The next day, Mark Baker, then Progenics' General Counsel, and Mr. McKinney met with Dr. Perez and terminated him.

## B.    Procedural History

Shortly after his termination, Dr. Perez filed a complaint with the Department of Labor, alleging that he was terminated in violation of the Sarbanes-Oxley Act in retaliation for whistleblowing.  After that claim was litigated without a final resolution, Dr. Perez filed his Complaint in this Court on November 2, 2010.  (See Complaint, ECF No. 1.)[2]  Dr. Perez was at first represented by counsel but later came to proceed pro se, including at trial.

The parties filed numerous motions in limine in the years between the filing of Plaintiff's Complaint in 2010 and the 2015 trial.  Several motions in limine are relevant to the post-trial motions.

With the consent of the parties following a pretrial conference, the Court ordered that because the parties agreed that the second and third elements of Plaintiff's Sarbanes-Oxley claim were met, only the first and fourth elements would be decided by the jury at trial.  (See Order at 1-2, Apr. 2, 2015, ECF No. 211.)  Generally, the four elements of a prima facie Sarbanes-Oxley cause of action are: (1) a plaintiff engaged in protected activity or conduct, (2) his employer was actually or

---

[2] Dr. Perez later filed an Amended Complaint.  (See Amended Complaint, Nov. 29, 2010, ECF No. 6.)

constructively aware of the allegedly protected activity, (3)
plaintiff suffered an adverse employment action, and (4) "[t]he
circumstances were sufficient to raise the inference that the
protected activity was a contributing factor in the adverse
employment action." Gattegno v. Admin. Review Bd., 353 Fed.
Appx. 498, 500 (2d Cir. 2009). Here, the parties do not dispute
that Progenics was aware of Plaintiff's August 4, 2008
memorandum, which was his alleged protected activity, and that
Plaintiff suffered an adverse employment action when he was
terminated. Therefore, the only disputed issues for trial were
1) whether Plaintiff engaged in protected activity when he wrote
his memorandum, more specifically, whether in light of Dr.
Perez's training and experience, he "had both a subjective
belief and an objectively reasonable belief that the conduct he
complained of constituted a violation of relevant law," Perez v.
Progenics Pharmaceuticals Inc., 965 F. Supp. 2d 353, 363-64
(S.D.N.Y. July 24, 2013) (citing Leshinsky v. Telvent GIT, S.A.,
942 F. Supp. 2d 432, 441, (S.D.N.Y. May 1, 2013)), and 2)
whether that memorandum was a contributing factor to his
termination.

In the same order, the Court upheld several of its previous
evidentiary rulings. For instance, the Court upheld its
previous ruling "prohibit[ing] Plaintiff from arguing that he
was terminated for reporting an omission because his [August 4,

2008] memorandum in fact only mentions alleged fraud and misrepresentations [in the May 2008 press release], not any omissions". (See Order at 5, ECF No. 211.)  The Court also upheld its decision precluding Plaintiff from introducing "evidence of information of which Plaintiff was not aware when writing his [August 2008] memorandum." (See id.)  Additionally, the Court upheld its order that Plaintiff would be permitted to testify in narrative form, while noting that "defense counsel will maintain leeway to object during Plaintiff's own testimony, opening statement, and summation." (See id.)  Furthermore, the Court upheld its ruling "precluding evidence regarding damages for loss of reputation, emotional distress, depression, and psychological injuries as not covered under Sarbanes-Oxley." (See id. at 6)

During the Final Pretrial Conference, the parties finalized their list of exhibits that would be admitted by stipulation at the beginning of trial and would be considered admitted in evidence even if not raised directly through witness testimony. The Court excluded a number of Dr. Perez's proffered exhibits from the stipulated list but noted that Dr. Perez would be permitted to use those exhibits for impeachment purposes should a witness give testimony that might be contradicted by one of those exhibits.

Following the jury verdict, judgment was entered on August 13, 2015 9ECF No. 250], but execution on the judgment was stayed. [ECF No. 256.]

C.   **Trial**

The parties tried the case before a jury beginning on July 28, 2015.  The Court noted on the record that all exhibits on the final list were received.  (See Trial Tr. at 3:15-18, July 28, 2015, ECF No. 242.)

Dr. Perez called himself as his first witness, testifying in narrative form on direct and responding to defense counsel's queries in traditional question-and-answer form on cross.  (See Trial Tr. at 18:17-112:12.)  The jury heard of his background, his work on Relistor, and his review of Progenics' May 2008 press release.  He testified as to the press release, quoting it as follows:

> The first of these studies, a phase 2 trial, evaluated the effects of an oral formulation of Relistor for the treatment of opioid-induced constipation in patients with chronic nonmalignant pain.  This study showed positive activity. . . .  The once daily oral formulation of Relistor showed statistically significant activity as

9

> assessed by the occurrence of spontaneous
>
> bowel movements and other efficacy
>
> measures. . . .

(See Trial Tr. at 24:7-14 (quoting May 2008 press release at 1-
2).)  Dr. Perez pointed the jury to the May 2008 press release's
quotation of Paul Madden, Progenics' founder, then-CEO and Chief
Science Officer: "We are pleased by preliminary finding of this
oral formulation."  (See id. at 24:14-18 (quoting May 2008 press
release at 2).)

Dr. Perez then testified about his receipt of the Wyeth
Update in ordinary interoffice mail in July 2008.  He stated,

> What was surprising to me when I got [the
>
> Wyeth Update] is that it stated . . . 'The
>
> results from oral phase 2 studies
>
> demonstrated that neither the tablet nor the
>
> capsule formulations had sufficient activity
>
> to satisfy the confirm advancement criteria
>
> specified in the approved target product
>
> profile.'  Let me clarify that 'confirm' is
>
> another word that we used internally at
>
> Wyeth and Progenics for Phase 3.
>
> This statement talks about a tablet and a
>
> capsule.  The relevant one for this case is

the tablet formulation, which was the

subject of the press release that I just

showed you.  In other words, this rationale

should be read, 'Results from oral phase 2

studies demonstrated that the tablet

formulation -- well, it cannot be reworded.

<u>In essence, it is saying the results from</u>

<u>oral Relistor phase 2 studies demonstrated</u>

<u>that neither the tablet nor the oral</u>

<u>formulations has sufficient activity to</u>

<u>satisfy phase 3 criteria specified in the</u>

<u>approved target profile.</u>

(See Trial Tr. at 25:21-26:13 (quoting Wyeth Update at 2)

(emphasis added).)  Dr. Perez testified as to how he interpreted

the Wyeth Update to contradict the "rosy picture" painted in the

May 2008 press release and described how he alerted Thomas Boyd,

head of his department, and Mark Baker, Progenics' then-General

Counsel, to this contradiction in his August 4, 2008 memorandum.

(See Trial Tr. at 29:17-31:20.)  The August 4 memorandum, states

in relevant part,

> The rosy picture in the press release is in
> sharp contrast with the assessment of this
> same trial in the [Wyeth Update], which
> shows that this formulation had no positive
> activity, efficacy was not met, and there is
> no reason to be pleased with this oral

> formulation that is deemed not worth
> pursuing further. . . .
>
> It is my moral duty to alert both Wyeth and
> Progenics that with the May 22, 2008 press
> release both companies are committing fraud
> against shareholders since representations
> made to the public were not consistent with
> the actual results of the relevant clinical
> trial, and I think this is illegal.

(See August 4, 2008 memorandum at 1-2.)

Dr. Perez testified that Mr. Baker read his email of the memo at 11:45 a.m. on August 4 and that Mr. Baker approached him over the lunch hour in the lunch room:

> It turns out that at lunch time I happened
> to be in the local break room of the company
> preparing my lunch and Mr. Mark Baker
> approached me and told me in a hostile voice
> that my computer had been removed.

(See id. at 31:23-32:1.)

> And sometime in the afternoon of that day,
> Mr. Robert McKinney, chief financial
> officer, came to my office and asked me how
> I got this document. Because of the
> hostility of these actions, removing my
> computer, which is an essential part to do
> my job, and the general counsel coming up to
> me and telling me in a hostile voice we have

removed your computer and that's the only

sentence he said, so in view of that, I

asked him for permission to speak to my

attorney and then he agreed.  Mr. McKinney

will testify that I did not refuse to answer

his question.  He simply gave me permission

to speak to my attorney.

The following day in the morning I was

called to a meeting with Mr. Baker and Mr.

McKinney.  And right up front, right at the

beginning of the meeting, two letters was

[sic] slid across the table and I was asked

to read those two letters.

(See id. at 32:6-20.)

Dr. Perez introduced the two letters as Plaintiff's

Exhibits 42 and 43.  Exhibit 42 is a letter from then-General

Counsel Mark R. Baker to Dr. Perez.  (See Pl.'s Ex. 42, Letter

from Mark R. Baker, General Counsel, Progenics Pharm. Inc. to

Dr. Julio Perez, Aug. 5, 2008.)  This letter addressed the

allegations in Dr. Perez's August 4, 2008 memorandum, describing

them as "without foundation" and relying upon "out of context

statements" in the Wyeth Update, which Mr. Baker noted had been

written by Wyeth's commercial group in July 2008.  (See Pl.'s

Ex. 42 at 1.)  Mr. Baker disputed Dr. Perez's allegation that

the Wyeth Update concluded that the Relistor clinical trials had "failed." (See id.) He also characterized Dr. Perez's various assertions as a "distortion" of the phase 2 trial results. (See id. at 2.)

Exhibit 43 is also from Mr. Baker to Dr. Perez and bears the same date. (See Pl.'s Ex. 43, Letter from Mark R. Baker, General Counsel, Progenics Pharm. Inc. to Dr. Julio Perez, Aug. 5, 2008.) In his second letter, Mr. Baker described the Wyeth Update, which Dr. Perez had quoted in his August 4, 2008 memorandum, as "an internal Wyeth document that is confidential and proprietary to Wyeth." (See id. at 1.) Mr. Baker's letter continued, "Progenics did not give a copy of this document to you [Dr. Perez] as it is unrelated to your work as a chemist for the Company." (See id.) The letter then accused Dr. Perez of obtaining the Wyeth Update "through inappropriate or illicit means" based on Dr. Perez's supposed refusal to answer CFO McKinney's question the previous day as to how he acquired the document. (See id.) The letter then reminded Dr. Perez of his obligation as an employee of Progenics to "maintain the confidentiality of information you receive in the course of your employment" and demanded that he

immediately provide to Mr. McKinney all copies of the [Wyeth Update] that are in your possession or control, and all copies

14

> of any other confidential information of
> Wyeth or [Progenics] that you have in your
> possession or control.

(See id.)  The letter concluded by insisting that Dr. Perez

"live up to your agreement to keep the information contained in

the [Wyeth Update] and any other confidential information of

Wyeth or [Progenics]) confidential."  (See id.)

Dr. Perez published both letters and read portions of them

to the jury.  (See Trial Tr. at 32:21-34:16.)  Dr. Perez also

published and read aloud a portion of his "employee patent

assignment and confidentiality agreement," which he testified

was attached as an exhibit to Plaintiff's Exhibit 43.[3]  (See id.

at 34:1-4.)  He pointed to a section entitled "Termination of

Employment" on page 2 of this attachment and read it to the jury

as follows:

> In the event of the termination of my
> employment at Progenics, whether or not such

---

[3] The Court's copy of Plaintiff's Exhibit 43 is a one-page
document consisting only of the letter itself and which does not
include an attachment.  (See Pl.'s Ex. 43.)  However, the
Court's copy of Defendant's Exhibit Z, the first page of which
is identical to Plaintiff's Exhibit 43, does include an attached
"Employee Patent Assignment and Confidentiality Agreement,"
which bears language matching that which Dr. Perez read for the
jury on the record as he described the "employee patent
assignment and confidentiality agreement" attached to Exhibit
43.  (See Def.'s Ex. Z, Letter from Mark R. Baker, General
Counsel, Progenics Pharm. Inc. to Dr. Julio Perez, Aug. 5, 2008,
ECF No. 62-26.)

> termination is voluntary, I will deliver
> promptly to my supervisor at Progenics all
> documents which relate to the business
> activities of Progenics and all materials
> and things which belong to or have been
> entrusted by others to Progenics.

(See id. at 34:4-9 (quoting Def.'s Ex. Z at ¶ 4).)  Pointing
back to Exhibit 43 and its demand that he return the information
in his possession and control, Dr. Perez explained to the jury
that Exhibit 43 amounted to a termination letter:

> In other words, they are asking me here to
> return everything back to the company in
> agreement with the language I just read to
> you a minute ago under the heading of
> termination of employment.  In other words,
> this was a termination letter telling me
> return everything back to the company,
> you're out of here.

(See Trial Tr. at 34:17-22.)

Dr. Perez also testified:

> Mr. Baker claims that in the termination
> meeting he told me if you don't give me --
> words to the effect that if you don't tell
> me how you got the document, I will

16

> terminate you and that I did not answer.
> That did not happen.  During that meeting I
> was not asked that question directly or
> indirectly in any way, shape, or form.  It
> turns out that later I find out that the
> decision to terminate had been made before
> that meeting and this is shown in the next
> exhibit that I will show you.

(See Trial Tr. at 34:23-35:6.)

Dr. Perez then offered Plaintiff's Exhibit 44, minutes of Progenics' Audit Committee meeting on August 5, 2008, the day he was terminated.  After noting receipt of Dr. Perez's August 4, 2008 memorandum, the minutes stated:

> The Company consulted with outside counsel
> and determined that it was necessary to
> terminate the employee as it was apparent
> that he had some access to confidential
> information.  The employee was subsequently
> terminated on August 5, 2008.

(See Pl.'s Ex. 44, Minutes of a Meeting of the Audit Comm. of the Bd. of Dir. of Progenics Pharm., Inc. 2, Aug. 5, 2008 (emphasis added).)

On the second day of trial, Dr. Perez first read excerpts from the deposition transcript of Dr. Thomas Boyd, who was Senior Vice President of Product Development at Progenics and the head of Plaintiff's department.  (See Trial Tr. at 124:11-

17

126:12, July 29, 2015, ECF No. 244.)  The quoted deposition
indicated that Dr. Perez had been working on an oral form of
Relistor and that he would have reasonably been aware of
information regarding the second phase of clinical trials.

Next, Dr. Perez called Vivien Wong, his former supervisor
at Progenics, to testify about the Relistor trials and Dr.
Perez's involvement working on Relistor.  (See id. at 126:22-
175:17).

Dr. Perez then read deposition testimony by Nicole
Williams, chair of the Progenics Audit Committee.  Ms. Williams
testified as follows:

> Q. Well, I am asking you if the audit
> committee ever made any determination as to
> whether the complaint submitted on August 4,
> 2008, by Dr. Perez was submitted in a
> reasonable, good faith belief that the press
> release complained about was misleading?
> A. Based on what Mark Baker told us as
> general counsel, we assumed that it was
> submitted without an understanding of what
> the real circumstances were in the Wyeth
> material.  And, you know, we assumed good
> faith, but we thought the employee was
> misguided.  What was concerning was the

18

confidential information, how he obtained it.

We didn't, you know, we were being informed

in real time about a situation that just

occurred. So we were focusing on the major

issues at that point which were that the

employee was being terminated for having

confidential information and not disclosing

how he got it.  That was very disturbing to

the audit committee.  But we don't make any

preconceived notions.  All of this material

would go with outside counsel and the

investigation would continue. . . .

(See id. at 176:18-177:11 (quoting Williams Dep., Nov. 10,

2011).)  Dr. Perez particularly emphasized with Ms. Williams

that the Audit Committee's notes suggest that the decision to

fire Dr. Perez was made on the day that he delivered his memo,

the day before he had his final meeting with the General Counsel

and CFO:

Q. I want to go back to this one more time.

August 5, 2008, the legal update, where it

says, the company consulted with outside

counsel and determined that it was necessary

to terminate the employee as it is apparent

that he had some access to confidential
information.

A. Yes.

Q. Did Mr. Baker tell the committee that day
that he terminated Dr. Perez's employment
based in part on advice from outside counsel?

A. I don't recall the specifics of his words
three years ago.

Q. Was it your impression that his
termination of Dr. Perez on August 5, 2008
was partially based upon advice from outside
counsel?

A. That was the interpretation we had, yes.

Q. That's what you thought he was telling
you?

A. Yes.

Q. OK.

A. But I can't recall his exact words.

Q. Obviously, I am not asking for exact
words. I am trying to get the sum and
substance. That's what you recall him telling
you?

A. And that's what the minutes reflect, but,

you know, I'm trying to be accurate here. I

don't recall exact words.

(See id. at 177:13-178:10 (quoting Williams Dep., Nov. 10,

2011).)

Dr. Perez then read the deposition testimony of Robert

McKinney, the CFO and Progenics' head of human resources:

Q. I want to go back for a second to August

4, 2008.  When you went in to speak to Dr.

Perez and ask him what you asked him --

I understand you have a certain document or

documents between Wyeth and Progenics.  Where

did you get them? OK. That's the conversation

I am referring to.

A. Yeah.

Q. That's basically the question you asked

him, correct?

A. Yes.

Q. And at that point he asked you to speak to

-- would it be OK if he spoke to his

attorney, correct?

A. Correct.

Q. You told him that it would be, correct?

A. I told him I couldn't stop him.

Q. Did he -- and the other thing that he said

was his access to the email had been

disabled, correct?

A. Correct.

Q. And that was all that was discussed?

A. Yes.

Q. Did he say to you, no, I am not going to

tell you where I got the document?

A. He did not.

Q. Did he refuse in any way to -- did he tell

you he was refusing to answer the question?

A. No.

Q. When you said that you couldn't stop him

from speaking to his attorney, did you give

him any deadline --

A. No.

Q. -- by which he had to do that and answer

the question?

A. No.

                            ***

Q. And then once he collected his belongings,

did he have them in a box or something?

A. He had a box, yes.

Q. You said we had a box?

A. We had a box for him and he used the box.

Q. That box was prepared for him when?

A. That morning.

Q. During the meeting with Mr. Baker?

A. During the meeting with Mr. Baker.

Q. Meaning the meeting --

A. The box isn't prepared. It's just a box

from copy paper.

(See id. at 180:18-182:8 (quoting McKinney Dep., Apr. 1, 2010)
(emphasis added).)

Dr. Perez then called Mark R. Baker, who was Progenics'
General Counsel in 2008 at the time of the termination and was
at the time of trial the CEO of Progenics.  (See id. at 184:10-
248:7.)  Throughout Mr. Baker's testimony, the Court observed
that Mr. Baker's demeanor in addressing Perez was condescending,
contemptuous, and patronizing.  At the outset, Dr. Perez began
his examination of Mr. Baker by saying, "Good afternoon, Mr.
Baker."  As reflected in the transcript, Mr. Baker did not
respond.  (See id. at 8:19.)  Not reflected in the transcript
was Mr. Baker's palpable hostility to Dr. Perez.  While Dr.
Perez was unfailingly polite and respectful to Mr. Baker, the
latter did not return the favor.  Mr. Baker spoke to Dr. Perez
in a demeaning manner, treating him with utter contempt.  "We

are English-speaking people,[4] we know how to read," Mr. Baker said to Dr. Perez in response to one question.  (See id. 195:14-15.)  Dropping his honorific, Mr. Baker occasionally addressed Dr. Perez in a condescending manner as "Julio" when he disagreed with Dr. Perez's account of the facts.  (See, e.g., id. at 215:3 ("A. No, Julio.  That never happened."); 223:21 ("A. Because we didn't know what else you might have, Julio . . . ."); 234:2 ("A. I didn't see any harm in it, Julio.").)  He was uncooperative during Dr. Perez's questioning, requiring the Court to intervene on multiple occasions to keep the testimony going:

> A. Could we move down to the next question or answer?
> THE COURT: Can you answer the question first?  Witnesses don't get to ask questions.

(See id. at 217:17-19.)

> A. . . . You know, we're working so hard to develop this drug and –
> THE COURT: Sir, it will go a lot faster if you just answer the question.

(See id. at 228:18-21.)

---

4 English is not Dr. Perez's first language.

A. Yes.  I received your memo, I went to

your office to talk to you about it.  You

weren't there.

THE COURT:  Sir, it will go a lot faster for

everyone if you just answer the question.

A. I think the answer to the question is

yes.

THE COURT: You know this is timed.  If you

use up a lot more time, I'll give some more

time to your opponent.  So answer the

questions.

(See id. at 229:10-18.)  The relationship between Mr. Baker and

Dr. Perez will inform the Court's decision regarding the

feasibility of Dr. Perez's reinstatement.  (See Part II.B.1,

infra.)

　　　After testimony about the Wyeth Update and his order to IT

to remove Dr. Perez's computer, Mr. Baker denied meeting Dr.

Perez in the breakroom (See Trial Tr. at 215:1-22) but said he

had agreed with Mr. McKinney that the latter should talk with

Dr. Perez.  (See id. at 216:11-19.)

Q. Did he report to you that he asked Dr.

Perez how he had obtained the document?

A. Yes.

Q. Did he report to you that Dr. Perez

requested time to speak with his attorney?

A. Yes.

Q. Did he report to you that he granted

plaintiff's request?

A. No.  He said to me Julio wants to show it

to his attorney.  I said why.  And he said,

well, he said he wanted it to show it to his

attorney and I said I can't stop him.

Q. I am referring now to your testimony on

January 8, 2010.  On page 192, line 17, it

says:

"Q. And did Mr. McKinney tell you that he

told Dr. Perez, OK, you can take some time to

confer with an attorney? "A. Yes."

Does that refresh your recollection?

A. Yeah.  He said he wasn't going to stop you

and you were going to consult with an

attorney.

Q. That's not the question.  It says, the

question is, did Mr. McKinney tell you that

he told Dr. Perez you can take some time to

confer with your attorney?

You answered yes.

A. Could we move down to the next question or
answer?

THE COURT: Can you answer the question first?
Witnesses don't get to ask questions.

A. In my deposition I see that I said yes to
that question, yes.

(See id. at 216:20-217:20.)

With respect to consulting with counsel and the decision to
terminate Dr. Perez, Mr. Baker testified:

Q. And did you consult with your attorney and
determine, would it be fair to state that you
consulted with your attorney and determined
that it would be necessary to terminate Dr.
Perez because he apparently had access to
confidential information?

A. No.  In that call we were discussing
possible alternatives depending on what you
would tell us.

Q. Let me rephrase my question.  Did you
after consulting with your attorney at some
point conclude that it would be necessary to
terminate Dr. Perez because he apparently had
access to confidential information?

A. Yeah, the time I decided that was when you wouldn't respond to me in the meeting that we held the next day and when I asked you where did you get the document, you didn't say anything to me. That's when I made the decision.

MR. PEREZ: Objection, your Honor. It's nonresponsive.

THE COURT: Sir, let me read you the question again. Did you after consulting with your attorney at some point conclude that it would be necessary to terminate Dr. Perez because he apparently had access to confidential information?

THE WITNESS: I believe my answer is responsive to that, yes. You asked me what time did I conclude that and the time I concluded —

THE COURT: The question was: Did you after consulting with your attorney at some point conclude that it would be necessary to terminate Dr. Perez because he apparently had access to confidential information?

Is your answer yes, is that what you said?

28

THE WITNESS: Answer, yes.

(See id. at 218:7-219:10.)

Mr. Baker was asked about the two letters handed to Dr. Perez at the August 5 meeting and then testified:

Q. Also in this letter you state in the third paragraph, Robert McKinney, our chief financial officer, asked you yesterday how you had obtained the document.  You refused to answer . . . .

Q. Is this statement accurate, "you refused to answer?"

A. I believe so, Dr. Perez.  I wanted to know how you had gotten that document.  Your answer was I have to talk to a lawyer.   I didn't know why you would have to talk to a lawyer.  It was a simple question.  And so from my point of view, you were refusing to give the document and we were meeting with you again to figure out why.

Q. Do you agree that Mr. McKinney allowed Dr. Perez time to consult with his attorney before answering?

> A. Yea, I agree that Rob said I can't stop
> you, you can consult with your attorney.
> That's how I understood.

(See id. at 226:2-5, 14-24.)

With respect to the Audit Committee minutes (see Pl.'s Ex. 44), Mr. Baker testified:

> Would it be fair to conclude that you made
> the decision to terminate prior to the
> meeting on August 5?
> A. No.
> Q. I draw your attention to the second - the
> last part that says the employee was
> subsequently terminated on August 5, 2008.
> A. Yes, that's completely accurate.  After I
> determined that I thought you had stolen the
> document because you wouldn't respond to my
> questions, I terminated your employment.
> Q. Isn't the language clear here that the
> company consulted with outside counsel and
> determined that it was necessary to terminate
> the employee and the employee was
> subsequently terminated on August 5, 2008?
> A. Yeah, that's a correct statement.  Your
> termination occurred after I talked to

counsel about what the alternatives might be
here and how we should handle them and after
I met with you and reached the conclusion
that you had stolen this memo because you
wouldn't respond to my questions and then I
decided to terminate you.

Q. The operative word here is "subsequently."

A. Yeah, the termination occurred
subsequently to both items – me talking to
counsel and getting advice the night before,
and me sitting down with you face to face and
saying, Julio, where did you get this
document and you not responding, not saying,
well, I need to speak to my counsel, not
saying, oh, I got it from a friend and I
can't give his name, not providing any
evidence and simply responding – not
responding to me.

(See id. at 227:15-228:17.)

On cross examination, Mr. Baker testified that if Dr. Perez
had told him on August 4 or 5 where he obtained the Wyeth
Update, he would not have terminated him, (see id. at 240:4-10),
and that the August 5 letters were not a termination (see id. at
240:13-19). He also testified that "[w]e still don't know as we

31

sit here today" where Dr. Perez got the Wyeth Update.  (See id. at 240:2-4).  Mr. Baker further testified that the Wyeth Update was confidential and only given to very senior Progenics employees.  (See id. at 207:1-208:5.)  Mr. Baker explained that Dr. Perez's possession of the document and Dr. Perez's failure to disclose how he had obtained the document raised in Mr. Baker's mind the possibility that Dr. Perez had acquired the document through inappropriate or illicit means.  (See id. at 214:16-21.)

At the beginning of the third day of trial, the Court permitted Dr. Perez to introduce a previously excluded document that his former attorney had submitted to the Department of Labor in September 2008.  (See Trial Tr. 261:12-277:2, July 30, 2015, ECF No. 246.)  This document served to rebut Progenics' argument in Defense counsel's opening and during Mr. Baker's testimony that Dr. Perez had not told anyone where he got the Wyeth Update until years later during litigation – implying that Dr. Perez later fabricated his testimony that he received the document through regular interoffice mail.  In response to that accusation of recent fabrication, Dr. Perez introduced a prior consistent statement from September 2008 in which he (through his attorney) stated that in July 2008 he received the Wyeth Update through ordinary interoffice mail.

Dr. Perez then read deposition testimony from Peter Lukacsko (see id. at 278:6-289:6), who was Senior Director of Project Management and testified about the poor results of the Relistor phase two clinical trials, which he characterized as "disappointing," and about Dr. Perez's involvement in the Relistor development, which would have included eventually reviewing outcomes of clinical studies.

Defense counsel read counter-designations from Mr. Lukacsko's deposition (see id. at 290:8-302:25), which indicated that Mr. Lukacsko never spoke with Dr. Perez about whether Relistor would advance to third-phase trials, noted that the second-phase trials showed statistically significant activity, stated that he had never received Wyeth documents through interoffice mail, claimed he had never seen the Wyeth Update before the day of his deposition, and affirmed that the May 2008 press release was accurate.

Next, Progenics read counter-designations from Dr. Thomas Boyd's deposition.  (See id. at 303:4-310:25.)  He testified that he was then Senior Vice President, Product Development, for Progenics, that the press release was accurate, and that the second-phase clinical trials showed statistically significant activity.

Progenics also read counter-designations from Mr. McKinney's deposition (see id. at 311:2-318:5), in which he

33

testified that Mark Baker made the decision to terminate Dr.
Perez and that Mr. Baker terminated Dr. Perez (see id. at
311:23-312:4), confirmed that when he asked Dr. Perez on August
4 where he had obtained the Wyeth Update that Dr. Perez asked if
he could speak with his lawyer, and that he responded "I can't
stop you from speaking with your lawyer."  (See id. 314:17-
315:10).[5]  As to the August 5 meeting, he testified that Mr.
Baker gave the two documents (see Pl.'s Ex. 42 and 43) to Dr.
Perez, asked him to read them, that Dr. Perez nodded that he
understood them, that Mr. Baker asked Dr. Perez where he
obtained the Wyeth Update, that Dr. Perez did not respond, and
Mr. Baker terminated him.  (See id. at 316:11-317:24.)

Next, Progenics played excerpts from the video-recorded
deposition of Dr. Bruce Schneider, who was a former Wyeth
Executive Vice President and Chief of Research Operations.  (See
id. at 328:4-355:10.)  Dr. Schneider's testimony indicated that
the second-phase trials showed statistically significant
activity, that the May 2008 press release was accurate, and that
the Wyeth Update was confidential.  In response, Dr. Perez
introduced a number of prior inconsistent statements and
contradictory documents to impeach Dr. Schneider's deposition

---

[5] Pages 314-317 of the transcript are incorrectly labeled
Lukackso" at the top; they should be labeled "McKinney" as pages
311-313 are.

testimony.  (See id. at 355:15-365:13.)  Of particular relevance

here, Dr. Perez offered a prior inconsistent statement in a

document that had been previously marked as Exhibit 35,[6] but

which had been excluded from the stipulated exhibit list and was

among the documents that the Court had ruled would only be used

for impeachment purposes.  Exhibit 35 is an email dated July 16,

2008, to some 33 individuals at Wyeth which attached the Wyeth

Update.  Dr. Perez offered this document to impeach Dr.

Schneider's testimony that the Wyeth Update was a highly

confidential document and not widely circulated within Wyeth.

Defense counsel did not object to the use of that document for

those purposes.  (See id. at 362:23-365:10.)

    In rebuttal, Dr. Perez re-called himself to testify

concerning his efforts to find employment.  (See id. at 394:2-

413:5.)  After lengthy argument as to a document relating to his

job search that had not been produced in its entirety in

discovery (see Part III.A.4, infra), Dr. Perez testified about

his attempts to find a job.  (See id. at 394:21-413:5.)

    Following Dr. Perez's rebuttal, Defendant called Dr. Paul

Maddon, the former Chief Executive Officer of Progenics.  (See

id. at 414:2-454:19; Trial Tr. 459:12-498:10 July 31, 2015, ECF

---

[6] The parties often incorrectly referred to this document as
"Exhibit 25" on the record.

No. 248.)  He also testified as to the results of the Relistor
trials and the accuracy of the May 2008 press release.

After summations and the Court's instructions, the jury
withdrew to deliberate.  During its deliberations, the jury
submitted a note to the Court requesting several documents,
including Exhibit 35, which had been marked for identification
purposes and used for impeachment but never received into
evidence.  (See id. at 577:14-585:16.)  Plaintiff and counsel
collected the requested documents, including Exhibit 35, and
handed them to the Court without objection, whereupon the Court
conveyed them to the jury.  After the jurors received all of the
requested documents, defense counsel notified the Court that
Exhibit 35 was not in evidence and should not have gone to the
jury.  The Court recovered Exhibit 35 from the jury and wrote a
curative note to the jury explaining that the document had been
given to them by mistake, that they should only consider it for
impeachment of Dr. Schneider's testimony and directing them to
refer again to the impeachment section of the jury instructions.
The Court also noted that Defense counsel had originally
consented to sending Exhibit 35 to the jury.  (See id. at
582:14-15.)

Later in its deliberations, the jury requested Plaintiff's
Exhibit 16, which contained Plaintiff's salary information.
(See id. at 585:18-587:6.)  Upon receipt of the note, Dr. Perez

asked to send to the jury a multiple-page document that showed his salary, benefits, and raises for each of the years he worked at Progenics.  Defense counsel argued that the only document that was admitted in evidence was the first page.  The Court overruled defense counsel's objection, noting that Dr. Perez had shown the entire document to the jury during his closing argument and that defense counsel had not objected that the whole document was not in evidence.  The Court's later review of the trial transcript revealed that the Court had explicitly admitted the entire, multipage document marked "Exhibit 16" on the third day of trial.  (See id. at 319:3-320:13.)

At the conclusion of deliberations, the jury returned its verdict that Plaintiff "ha[d] proven by a preponderance of the evidence that he engaged in protected activity as defined by the Sarbanes-Oxley Act," that Plaintiff "ha[d] proven by a preponderance of the evidence that Plaintiff's protected activity was a contributing factor to his termination," and that "Plaintiff is entitled to receive . . . $1,662,951.00."  (See Jury Verdict Form at ¶¶ 1-3.)

## II. Plaintiff's Motions

### A.   Motion for Prejudgment Interest

Plaintiff moved for an order granting prejudgment interest in the amount of $613,277.20.  (See Pl.'s Notice of Mot. for

Prejudgment Int. at 1.)  Defendant filed a response in
opposition to this motion.  (See Def.'s Mem. of Law in Opp. To
Pl.'s Mot. for Prejudgment Int. ("Def.'s Prejudgment Resp."),
Sept. 21, 2015, ECF No. 273.)  Plaintiff filed his reply in
support of the motion.  (See Pl.'s Reply Mem. of Law in Supp. of
His Mot. for Prejudgment Int., Oct. 19, 2015, ECF No. 294.)

Defendant does not dispute that an employee who brings a
successful whistleblower retaliation claim for wrongful
termination under Sarbanes-Oxley is entitled to prejudgment
interest.  Indeed, the Court's discretion to award prejudgment
interest in a suit to enforce a federal right is firmly
established.  See Endico Potatoes, Inc. v. CIT Group/Factoring,
Inc., 67 F.3d 1063, 1071-72 (2d Cir. 1995) (citations omitted).
However, Defendant argues that if the Court denies its post-
trial motion for a new trial and the jury's verdict stands, then
the Court's award of prejudgment interest should be calculated
differently from the figures that Plaintiff supplied.

### 1.   Interest Percentage

In the first portion of this argument, Defendant asserts
that Plaintiff relied upon the incorrect statutory interest rate
when calculating his prejudgment interest.  Dr. Perez's proposed
prejudgment interest calculation relied upon a 9% interest rate,
which is the prejudgment interest rate established under the New

York State Civil Procedure Law and Rules ("N.Y. C.P.L.R."),
Section 5004.  (See Pl.'s Mem. of Law in Supp. of His Mot. for
Prejudgment Int. ("Pl.'s Prejudgment Mem.") at 3, ECF No. 258.)

The Court of Appeals has ruled that the rate used to
calculate prejudgment interest is a "matter[] confided to the
district court's broad discretion, and will not be overturned on
appeal absent an abuse of that discretion." Endico, 67 F.3d at
1071-72.  Defendant has suggested that the Court should apply
the federal post-judgment interest rate, as set forth in 28
U.S.C. § 1961(a), which states that such interest

> shall be calculated from the date of the
> entry of the judgment, at a rate equal to
> the weekly average 1-year constant maturity
> Treasury yield, as published by the Board of
> Governors of the Federal Reserve System, for
> the calendar week preceding.

(See Def.'s Prejudgment Resp. at 4.)  Defendant quotes a
previous decision of the Court to the effect that where,

> a judgment is based on violations of both
> federal and state law, courts in this
> circuit uniformly have applied a federal
> interest rate, most commonly based on the
> average rate of return on one year Treasury
> bills . . . for the relevant time period.

(See id. at 3, citing Thomas v. iStar Financial, Inc., 508
F.Supp.2d 252, 264 (S.D.N.Y. Sept. 7, 2007)).  Noting that
Plaintiff has only asserted a federal claim in this case,
Defendant argues that there is "no question" that the federal
interest rate applies.  (See id. at 3.)

However, notwithstanding the assertions of Defendant and the decision it cites, the Court has in fact awarded the N.Y. C.P.L.R. § 5004 9% interest rate as prejudgment interest to a Plaintiff who only asserted a federal claim.  In <u>Malarkey v. Texaco, Inc.</u>, the Court used the New York State 9% figure to calculate a plaintiff's prejudgment interest on a federal retaliation claim against her employer.  794 F. Supp. 1237, 1242-43 (S.D.N.Y. May 12, 1992).

The Court finds that the New York statutory interest rate is appropriate.  As the Court of Appeals has ruled, the award of prejudgment interest

> should be a function of (i) the need to
> fully compensate the wronged party for
> actual damages suffered, (ii) considerations
> of fairness and the relative equities of the
> award, (iii) the remedial purpose of the
> statute involved, and/or (iv) such other
> general principles as are deemed relevant by
> the court.

<u>Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. Of Elec. Workers, AFL-CIO</u>, 955 F.2d 831, 834 (2d Cir. 1992).

The need to compensate the wronged party for actual damages suffered after several years without employment commensurate with his professional skills is significant.  The Court credits Plaintiff's testimony regarding the adverse effect that his

termination has had on his employment prospects and long term
financial well-being.  (See Trial Tr. at 394:21-413:5.)

As to the considerations of fairness and equity, the jury
credited – and the Court agrees – Plaintiff's testimony
regarding the abrupt manner in which Defendant fired Plaintiff
without granting him an opportunity to explain his good-faith
protected conduct, in which the jury found he had engaged.  In
the case at bar, as in Malarkey, the parties to the action are a
New York State resident and a corporation doing business in the
State of New York.  The Court can find no remedial purposes of
the Sarbanes-Oxley statute or other general principles that
would suffer by the Court's application of the New York interest
rate to this federal claim, as it did in Malarkey.  Accordingly,
the Court will exercise its discretion to apply the 9% interest
rate as prescribed in N.Y. C.P.L.R. § 5004.

### 2.   Interest Time

Prejudgment interest accrues from the time of Plaintiff's
termination to the time the Court entered judgment in his case.
See United Bank Ltd. V. Cosmic Intern., Inc., 542 F.2d 868, 877-
78 (2d Cir. 1976) (citing N.Y. C.P.L.R. § 5001 for the assertion
that prejudgment interest in New York state courts, including
federal courts, accrues from the earliest ascertainable date the
cause of action existed) (internal citations omitted); see also

41

NML Capital v. Republic of Argentina, 435 F. App'x 41, 2 (2d
Cir. 2011) (holding that prejudgment interest ceases to accrue
on the date that the judgment is first ascertained in a
meaningful way) (internal citations omitted).  Here, the parties
calculated prejudgment interest on these motions from August 6,
2008, the first full day after Progenics terminated Dr. Perez's
employment, to July 31, 2015, the nearest month end to the date
the Court entered judgment in Plaintiff's favor.

Defendant argues that the Court should reduce Plaintiff's
prejudgment interest time period because Plaintiff is
responsible for the extraordinary length of the litigation.
There is no basis for this argument.  This case was reassigned
to a different judge on three different occasions throughout the
course of litigation through no fault of the Plaintiff's.

Furthermore, although it is true that Plaintiff did file
numerous motions and requests for extensions during that time,
Defendant did the same.  Defendant's motions included a motion
for summary judgment on the issue of retaliation - clearly a
disputed issue of material fact on which it would lose at trial
(see Def.'s Notice of Mot. for Summ. J. Pursuant to Fed. R. Civ.
P. 56, Feb. 8, 2013, ECF No. 58), as well as a motion for
reconsideration of that motion when it was denied (see Def.'s
Notice of Mot. for Reconsideration Pursuant to Local Rule 6.3,
Sept. 6, 2013, ECF No. 111), all of which extended the

litigation from February 2013 to September 2014.  The Court
finds no basis to penalize Plaintiff, a pro se litigant, for
advocating on his own behalf just as zealously as his employer.

In light of the time it has taken to brief and resolve the
post-trial motions, the prior judgment (ECF No. 250) is
withdrawn.  The parties shall recalculate interest through
September 9, 2016 (or the nearest month end), consistent with
the resolutions herein, and submit the recalculations no later
than September 8.

### 3.   Calculation

Plaintiff and Defendant agree that prejudgment interest, if
calculated, should be derived from an amount equal to the jury's
award of compensatory damages, divided across the years to which
the prejudgment interest period applies.  (See Pl.'s Prejudgment
Mem. at 3-5; Def.'s Prejudgment Resp. at 4-6.)  However, the
parties disagree as to how frequently the interest rate should
compound, with Plaintiff arguing it should be compounded monthly
and Defendant arguing it should be compounded annually.  (See
Pl.'s Prejudgment Mem. at 4; Def.'s Prejudgment Resp. at 4-5.)
As the Court of Appeals has ruled, "Given that the purpose of
back pay is to make the plaintiff whole, it can only be achieved
if interest is compounded."  See Saulpaugh v. Monroe Community
Hosp., 4 F.3d 134, 145 (2d Cir. 1993).  Courts within this

43

Circuit typically apply prejudgment interest on an annual compounding basis.  See, e.g., Robinson v. Instructional Systems, Inc., 80 F. Supp. 2d 203, 208 (S.D.N.Y. Jan. 25, 2000) (applying annually compounded interest).  Given that the Court has already elected to apply the 9% N.Y. C.P.L.R. interest rate in this case in lieu of the much lower federal post-judgment interest rate (see Part II.A.1, supra), it seems that an annual rate of compound interest will satisfy the Court of Appeals' guidance to "make the plaintiff whole."  See Saulpaugh, 4 F.3d at 145.  Accordingly, monthly compounding is unnecessary.

The parties also disagree as to how the jury's compensatory damages award should be distributed across the years in the prejudgment interest period for purposes of interest calculation.  Plaintiff submitted to the Court a projected series of annual incomes for the years 2008-2015, using his 2007 income of $203,337.00 as a baseline, and assuming annual salary raises of 3.44% per year for 2008-2015, with a resulting projected income of $84,811.20 for 2008, $217,567.20 for 2009, $225,051.51 for 2010, $232,793.28 for 2011, $240,801.36 for 2012, $249,084.92 for 2013, $257,653.44 for 2014, and $155,188.24 for 2015.  (See Pl.'s Prejudgment Mem. at 3-4.) Defendant cited decisions of this Court to suggest that the Court should first divide the jury's compensatory damages award "pro rata over the appropriate time period . . . ."  (See Def.'s

Prejudgment Resp. at 4-5 (citing Thomas, 508 F. Supp. 2d at 264 (internal citation omitted); see also E.E.O.C. v. Yellow Frgt. Sys., Inc., No. 98 Civ. 2270 (THK) 2002 WL 31011859, at *33 (S.D.N.Y. Sept. 9, 2002).)

The Court agrees with Defendant that a pro rata distribution of the compensatory award across the relevant period is the best method of fulfilling the intent of the prejudgment interest award: that Plaintiff be made whole.  See Saulpaugh, 4 F.3d at 145.  Accordingly, the parties shall re-calculate the prejudgment interest award as follows:  (1) The jury's compensatory damages award of $1,662,951 (see Jury Verdict Form, ¶ 3) is distributed pro rata across the time period from the day after Plaintiff's termination, August 6, 2008, to September 9, 2016, the date that judgment will be entered (or the nearest month end).  See Thomas, 508 F. Supp. 2d at 264.  An interest rate of 9% per annum, compounded annually, is to be applied to the distributed compensation portion for each year, 2008-2016.  See id., see also Malarkey 794 F. Supp. 1237, 1242-43.  Subtracting the compensatory damages amount, which the jury already awarded Plaintiff, will result in the amount of prejudgment interest.

### 4.   Conclusion

For the foregoing reasons, Plaintiff's motion for prejudgment interest is granted.  The parties shall re-calculate interest through September 9, 2016 (or the nearest month end), consistent with the resolutions herein, and submit those re-calculations no later than September 9.

## B.   Motion for Reinstatement

On August 31, 2015, Plaintiff also moved for an order granting his reinstatement.  (See Pl.'s Notice of Mot. and Mem. of Law, ECF Nos. 259-60.)  Defendant likewise filed a response in opposition to this motion on September 21, 2015.  (See Def.'s Mem. of Law and Aff., ECF Nos. 271-72.)  Plaintiff filed his reply in support of the motion on October 19, 2015.  (See Pl.'s Reply Mem. of Law, ECF No. 292.)

### 1.   Feasibility

Defendant argues that reinstatement is not feasible because Dr. Perez's position at Progenics no longer exists and that he would have been subject to layoffs in January 2009.  (See Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Reinstatement ("Def.'s Rein. Opp'n") 5-7, Sept. 21, 2015, ECF No. 271.)  Defendant alleges that the type of research that Dr. Perez performed on Relistor concluded in 2008 and that Progenics shifted all

46

remaining Relistor work to Wyeth in 2009, completely eliminating its research department by 2012. (See id. at 5-6 (citing Aff. of Sheldon Hirt in Opp'n to Pl.'s Mot. for Reinstatement ("Hirt Aff.") at ¶¶ 3-7, 9, 11, 12, 20, 24, 26).) Defendant goes on to allege that it has since shifted its business focus "entirely" away from opioid-related research to radiopharmaceutical imaging and oncology. (See id. at 6 (citing Hirt Aff. at ¶¶ 28-35.) Defendant alleges that Plaintiff "would not be a match" for its new projects, which require different experiences and skill sets from Dr. Perez's. (See id. at 6 (citing Hirt Aff. at ¶¶ 31-36).) Finally, Defendant alleges that, after a series of layoffs that began in 2009, it reduced its workforce from 244 employees, with 192 in research and development, to only 57 employees, with no research department and zero chemists. (See id. at 6 (citing Hirt Aff. at ¶¶ 13-18).) Defendant argues that Dr. Perez would have been terminated in the first round of layoffs, beginning in January 2009. (See id. at 7 (citing Hirt Aff. at ¶¶ 19, 21).)

Plaintiff counters that he possesses skills that would still be useful to Defendant in its radiopharmaceutical imaging and oncology projects. (See Pl.'s Mem. Of Law in Supp. of His Mot. for Reinstatement ("Pl.'s Rein. Mem.") 2-4, Aug. 31, 2015, ECF No. 260.) He cites his resume, which lists experience designing and executing the synthesis of pharmaceutical agents

for oncology and diagnostic imaging, developing diagnostic imaging drug candidates, and designing and synthesizing radiolabeled compounds, including supervisory positions in the above-listed fields. (See id. at 2-3 (citing Pl.'s Ex. 1, Resume, Julio Perez, Ph.D.) Plaintiff also cites performance evaluations he received from Defendant, which recognize his contributions to the coordination of radiolabeling projects in 2005, 2006, and 2007. (See id. at 3-4 (citing Pl.'s Ex. 6, Performance Appraisal, Julio Perez: 2005 5, Feb. 7, 2006; Pl.'s Ex. 8, Performance Appraisal, Julio Perez: 2006 8, Jan. 10, 2007; Pl.'s Ex. 19, Performance Appraisal, Julio Perez: 2007 9, [Date Redacted]).

Plaintiff also notes that he was not a member of the research group that Defendant describes at length in its account of the post-2008 downsizing. (See Pl.'s Reply Mem. of Law in Supp. of His Mot. for Pl.'s Reinstatement ("Pl.'s Reinstatement Reply") 7, Oct. 19, 2015, ECF No. 292.) He describes how he worked instead in the Preclinical and Product Development Department at Progenics, which was not eliminated, and lists several of that Department's employees, including employees who testified in these proceedings, who remain with Progenics. (See id.) Thus, the Court is not persuaded that reinstatement is not feasible for these reasons.

The Court is persuaded, however, that reinstatement is not feasible because "manifest hostility exists between Dr. Perez and Progenics." (See Def.'s Resp. in Opp. at 7, ECF No. 271.) Based on the Court's observation of the demeanor and interactions of the parties in the course of trial and throughout this litigation, particularly the interaction between Dr. Perez and Mark Baker, Progenics current CEO (see Part I.C, supra), it appears that the animosity between Plaintiff and Defendant is sufficient to render Plaintiff's reinstatement as Defendant's employee impossible. See Whittlesey v. Union Carbide Corp., 742 F.2d 724, 729 (2d Cir. 1984) (upholding a District Court's grant of front pay as compensation for employee whose employer had exhibited "such hostility and outrage" against him that reinstatement appeared to be impossible). Accordingly, the Court will proceed to analyze whether front pay is a more feasible remedy for Plaintiff's reinstatement rights.

## 2.   Front Pay

With reinstatement not feasible, the Court considers whether Defendant should pay Plaintiff front pay in order to make him "whole" for the damage it caused him by terminating his employment in violation of Sarbanes-Oxley, in a case where the Court believes that "[p]laintiff has no reasonable prospect of obtaining comparable alternative employment." See Reed v. A.W.

Lawrence & Co., Inc., 95 F.3d 1170, 1182 (2d Cir. 1996)
(upholding a grant of front pay where the District Court found
that antagonism between the parties would make reinstatement
inappropriate, and the plaintiff made a good faith effort to
mitigate damages) (internal quotation omitted).  As the Court of
Appeals held in Whittlesey,

> Denial of reinstatement in those situations,
> without an award of reasonable, offsetting
> compensation, would leave the plaintiff
> irreparably harmed in the future by the
> employer's discriminatory discharge, and
> would permit the defendant's liability for
> its unlawful action to end at the time of
> judgment.  To prevent this injustice a
> reasonable monetary award of front pay is
> necessary as 'equitable relief' . . .
> appropriate to effectuate the purposes of
> [the Act].

742 F.2d at 728.

Here, the Court credits Plaintiffs' testimony at trial that
Plaintiff has made a good-faith effort to mitigate his damages
for over seven years and that his prospects for future
employment are unpromising in part due to Defendant's violations
of his rights.  (See Trial Tr. 409:8-410:18.)  Defendant argues
that, even if Plaintiff were entitled to front pay, the jury's
verdict has already compensated him for such damages.  The Court
disagrees.  The jury charge instructed the jury that it could
award back pay "to the present time:"

> The Sarbanes-Oxley Act entitles plaintiff to
> compensatory damages.  Compensatory damages

> are designed to make plaintiff whole, that
> is, to compensate him for the damage
> suffered as a result of defendant's
> violation.  Here, you may award monetary
> damages to cover back pay or lost
> compensation, including the reasonable value
> of earnings, employment opportunities, and
> benefits lost to the present time."

(See Trial Tr. at 572:2-8) (emphasis added).  There is no

discussion of front pay.  Thus, Defendant's argument that the

jury already awarded front pay is without basis.

Defendant next argues that the calculation of front pay is

speculative.  Again the Court disagrees.  As the Court of

Appeals has ruled, when calculating front pay, the Court should

"assume, absent evidence to the contrary, that the illegally

discharged employee would have continued working for the

employer until he or she reached normal retirement age."

Whittlesey, 742 F.2d at 727 (internal quotation omitted).  In

this case, Plaintiff has calculated for the Court a conservative

estimate of his expected earnings from his age at the time of

the verdict, 58 years and 2 months, until a reasonable

retirement age of 66 years and 6 months.  The expected earnings,

which do not anticipate promotions and only factor in raises

commensurate with previous pay increases, add up to

$2,706,585.00.  The Court is satisfied with the calculation as

laid out in Plaintiff's memorandum of law (see Mem. at 13, ECF

No. 260) and therefore grants Plaintiff's motion for

reinstatement in the form of an order for front pay in the amount of $2,706,585.00.

### 3.   Conclusion

For the foregoing reasons, Plaintiff's motion for reinstatement is denied, but his motion for front pay is granted in the amount of $2,706,585.00.

### D.   Attorney's fees

On September 1, 2015, Plaintiff's former attorneys from the law firm of Westermann, Sheehy, Keenan, Samaan, & Aydelott, LLP ("Westermann") moved for an order granting Plaintiff's reinstatement. (See Westermann's Notice of Mot. and Affirmation, ECF Nos. 262, 264.) Defendant responded in opposition to this motion on September 21, 2015. (See Def.'s Mem. of Law and Aff., ECF Nos. 269-70.) Westermann filed their reply in support of the motion on October 1, 2015. (See Westermann's Reply Affirmation, ECF No. 288.)

The Sarbanes-Oxley Act provides that an employee prevailing in any action for wrongful discharge in violation of the statute's whistleblower protection section

> shall be entitled to all relief necessary to
> make the employee whole . . . [which] shall
> include . . . compensation for any special
> damages sustatined . . . including
> litigation costs, expert witness fees, and

reasonable attorney fees.

18 U.S.C. § 1514A(c).

In the case at bar, there seems to be no dispute that Westermann served as Plaintiff's attorneys from the filing of the action on November 2, 2010 until February 17, 2012, when the Court granted Westermann's motion to withdraw as counsel. However, Westermann asserts no basis under which it may claim standing to bring such a claim against Defendants under Sarbanes-Oxley.  The Court can find no precedent for such a claim, although it notes that the Court of Appeals has ruled in similar cases involving a federal civil rights law that a former attorney who withdrew as counsel lacked standing to claim attorney's fees from a defendant in his own name.  See Brown v. General Motors Corp., Chevrolet Div., 722 F.2d 1009, 1011 (2d Cir. 1983) (reasoning that 42 U.S.C. § 1988 authorizes the court to grant attorney's fees to a "prevailing party," but affirming the District Court's denial of attorney's fees to a discharged attorney).

The reasoning underlying the Court of Appeals' decision in Brown applies equally in the case at bar.  The text of 18 U.S.C. § 1514A(c) is substantially similar to that of 42 U.S.C. § 1988 in this regard.  The former entitles an "employee prevailing in any action under subsection (b)(1)" (the law's substantive provisions) to relief including "litigation costs, expert

53

witness fees, and reasonable attorney fees."  18 U.S.C.

§ 1514A(c).  The latter entitles a "prevailing party" in "any

action or proceeding to enforce a provision of sections 1981,

1981a, 1982, 1983, [etc.]" to "reasonable attorney's fees as

part of the costs."  42 U.S.C. § 1988.  Likewise, the policy

reasoning that supported the Court of Appeals' decision in Brown

is just as relevant in the context of Sarbanes-Oxley:

> Where an attorney and client have
> independent entitlements in the same action
> a conflict of interest is created.  Defense
> counsel will agree only to settlements which
> satisfy the attorney as well as the client.
> A client willing to settle for [a relatively
> small amount] will be thwarted if his or her
> attorney asserts a further right to [a
> larger amount] from the defendant.

Brown, 722 F.2d at 1011.

In light of the plain meaning of the statutory text's

"prevailing party" language, the analogous precedent of the

Court of Appeals' Brown decision, and the compelling interest of

prevailing plaintiffs to collect judgments independent of their

former counsel's interests, Westermann's unsupported assertions

that the lack of standing is merely a "procedural defect" ripe

for remedy as a "clerical mistake" under Rule 60 of the Federal

Rules of Civil Procedure are unpersuasive.  (See Westermann's

Reply in Supp. at 2-3, ECF No. 288.)

In the alternative, Westermann moves for leave to renew its

application for a charging lien and grant Plaintiff, Dr. Perez,

leave to file a motion for attorney's fees and costs pursuant to
the Sarbanes-Oxley Act.   (See id. at ¶ 33.)   The alternative
motion is persuasive.

As discussed above, Sarbanes-Oxley clearly confers upon
Plaintiff the right to move for attorneys fees in this action.
See 18 U.S.C. § 1514A(c).   New York Judiciary Law § 475 provides
that an attorney who appears for a party "has a lien upon [the
party's cause of action, claim or counterclaim, which attaches
to a verdict . . . in [the] client's favor."   N.Y. Jud. Law
§ 475.   This lien attaches "[f]rom the commencement of an
action," and "cannot be affected by any settlement between the
parties before or after judgment . . . ."   Id.   This provision
applies to charging liens even "in federal courts sitting in New
York," where it "creates an equitable right and remedy."   Itar-
Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442,
448-49 (2d Cir. 1998) (internal citations omitted).   An
attorney's permitted withdrawal from representation of a party
"does not affect his entitlement to the statutory lien under
Section 475."   Id. at 451 (citing Klein v. Eubank, 87 N.Y.2d
459, 462 (N.Y. 1996)).

Here there can be no dispute that Westermann appeared on
behalf of Plaintiff and served as Plaintiff's counsel from
November 2, 2010 to February 17, 2012.   It is therefore entitled
to a lien for the value of its services.

The Court notes that Rule 54 of the Federal Rules of Civil Procedure requires that, "[u]nless a statute or a court order provides otherwise [a motion for attorney's fees] must . . . be filed no later than 14 days after the entry of judgment." Fed. R. Civ. P. 54. The Court will therefore provide sufficient time for Plaintiff to move for attorney's fees after entry of Westermann's charging lien.

Accordingly Westermann's motion for attorney's fees is denied for lack of standing. Westermann's alternative motion for leave to renew its application for a charging lien is granted on the condition that the motion is filed by September 9. The Court also grants Plaintiff leave to file a motion for attorney's fees within ten days of the Court's entry of a charging lien for Plaintiff's former counsel, Westermann.

### III. Defendant's Motion

Defendant moved for a new trial or in the alternative for remittitur. (See Notice of Def.'s Mot. for a New Trial or in the Alternative for Remittitur, Sept. 10, 2015, ECF No. 266.) Plaintiff responded in opposition. (See Pl.'s Mem. of Law in Opp. to the Def.'s Mot. for a New Trial or in the Alternative for Remittitur ("Pl.'s New Trial Resp."), ECF No. 305.) Defendant replied in support of the motion on January 22, 2016. (See Def.'s Reply Mem. of Law in Supp. of Def.'s Mot. for a New

Trial or in the Alternative for Remittitur, Jan. 22, 2016, ECF
No. 313.)

**A.    New Trial**

The Federal Rules of Civil Procedure provide that the Court
may grant a new trial on some or all of the issues to any party
"for any reason for which a new trial has heretofore been
granted in an action at law in federal court . . . ."  Fed. R.
Civ. P. 59.  This rule authorizes the Court "to grant a new
trial based on the weight of the evidence only if it determines
that the jury's verdict was seriously erroneous . . . or a
miscarriage of justice . . . ."  Elyse v. Bridgeside Inc., 367
F. App'x 266, 268 (2d Cir. 2010) (internal citations and
quotations omitted).  The Court "should only grant such a motion
when the jury's verdict is egregious . . . and should rarely
disturb a jury's evaluation of a witness's credibility."  DLC
Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir.
1998) (internal citations and quotations omitted).  Moreover, a
trial judge is free to weigh the evidence herself and need not
view it in the light most favorable to the verdict winner.  See
id.

Where a party moves for a new trial on the basis of the
Court's error in an evidentiary ruling, the movant must
establish a "clear abuse of discretion" that "was so clearly

prejudicial to the outcome of the trial" that the jury's verdict was "seriously erroneous" or a "miscarriage of justice."  See Luciano v. Olsten Corp., 110 F.3d 210, 217 (2d Cir. 1997) (internal citations and quotations omitted).  The Court "measure[s] prejudice by assessing the error in light of the record as a whole."  See id.

Defendant seeks a new trial based on a number of different theories.  First, it argues that Plaintiff presented evidence regarding omissions from the May 2008 press release in violation of the Court's in limine order prohibiting such evidence.  Second, it argues that Plaintiff presented evidence about information of which he was not aware at the time he drafted his August 4, 2008 memorandum, in violation of the Court's in limine order prohibiting such evidence.  Third, it argues that both Plaintiff's use of the Wyeth Update Email (Exhibit 35) during trial and the delivery of that document to the jury during deliberations warrant a new trial.  Fourth, it argues that a new trial is justified because the only documentary evidence of Dr. Perez's attempts to find a job was not produced until the middle of trial.  Fifth, it argues that the Court's preclusion of a Wyeth-Progenics Development Plan from 2006 was prejudicial.  Sixth, it argues that the Court should not have admitted prior consistent statement evidence, offered by Plaintiff, which rebutted Defendant's argument that Plaintiff fabricated his

testimony that he received the Wyeth Update through the interoffice mail.

Under the strict standards described above, Defendant's motion for a new trial must fail under all of these theories for the reasons set forth below.

### 1.    Testimony on Omissions from the May 2008 Press Release

Defendant argues that Plaintiff violated the Court's pretrial orders by relying on precluded evidence regarding omissions from the May 2008 press release.  (See Def.'s Mem. of Law at 5-6, ECF No. 267.)  However, Defendant failed to object timely to the introduction of what is supposedly such evidence.[15] Nowhere in Defendant's numerous citations to the transcript does Defendant identify a moment at trial where Defendant preserved its objection to any testimony regarding the May 2008 press release's supposed omissions.  At the end of Plaintiff's direct testimony, which Defendant quotes extensively in support of its

---

[15] Federal Rule of Evidence 103(a) states:
>        A party may claim error in a ruling to admit
>        or exclude evidence only if the error
>        affects a substantial right of the party
>        and:
>        (1) if the ruling admits evidence, a party,
>        on the record:
>        (A) timely objects or moves to strike; and (B) states
>        the specific ground, unless it was apparent from the
>        context . . . .
>        Fed. R. Evid. 103(a).

argument that Plaintiff violated the Court's order and
Defendant's right to a fair trial, the Court and Defense counsel
engaged in the following colloquy:

> THE COURT: Anything else on the record,
> gentlemen?
>
> MR. B. FENSTERSTOCK: No, your Honor.

(See Trial Tr. at 44:13-15.)

Even if Defendant had preserved such an objection, its
allegation of omission-based arguments is without merit.
Defense counsel asserts that the Court's prior ruling that Dr.
Perez could not rely on omissions in the Press Release meant
that "anything that was not stated in the Press Release . . .
could not be used as evidence to support Dr. Perez's allegedly
reasonable belief that what was said in the Press release was
fraudulent." (See Aff. of Blair C. Fensterstock ("Fensterstock
Aff.") at ¶ 42, Sept. 10, 2015, ECF No. 266.) He then argues at
length that "any testimony or documents regarding advancing from
Phase 2 to a Phase 3 study had nothing to do with the Press
Release, (see id. at ¶ 43), that Dr. Perez's characterization of
the Press Release as "a rosy picture of an unmitigated failure"
violated the "no omissions" order (see id. at ¶ 49), and that
"Dr. Perez testified, in violation of the pre-trial orders
excluding omissions, that the Press Release was fraudulent
because it did not say anything about advancing the clinical

trials from Phase 2 to Phase 3." (See id. at ¶ 50 (citing Trial

Tr. at 110:18-21, 111:9-11.) Defense counsel argues, in direct

contravention of the plain text of the Wyeth Update, that the

Phase 2 clinical trials,

> [w]ere not being conducted for the purpose
> of advancing to Phase 3 . . .  The study
> itself had <u>nothing to do with Phase 3</u>. . . .
> Thus, any testimony, documents, or
> questioning referencing Phase 3 was an
> improper reference to an omission from the
> [May 2008] press release.

(See Fensterstock Aff. at ¶¶ 43-44 (emphasis added).)

To evaluate this argument, the Court need look no further

than the first line of the first slide of the Wyeth Update:

> Decision: <u>Do not initiate oral Phase 3</u>
> <u>program</u> . . . Rationale: Results from oral
> Phase 2 studies demonstrated that neither
> the tablet nor the capsule formulations had
> sufficient activity to satisfy the Confirm
> advancement criteria specified in the
> approved target product profile."

(See Wyeth Update at 1 (emphasis added).) The link between

Phase 2 and Phase 3 is self-evident. Wyeth's and Progenics'

decision on whether to advance Relistor to Phase 3 was based, at

least in part, on the results of Phase 2 testing. At the very

least, it was objectively reasonable for Dr. Perez, reading this

slide, to think that there was a link between Phase 2 and Phase

3. Dr. Perez's testimony that there was a conflict between the

affirmative representations of the May 2008 press release and

the Wyeth Update did not run afoul of the Court's prior order
regarding omissions.  (See Trial Tr. at 29:17-31:20.)

Accordingly, the Court finds that Defendant has failed to
establish any wrongdoing by Plaintiff or prejudice to Defendant
on this issue.

### 2.    Testimony on Facts Unknown to Defendant on August 4

Defendant objects to "Plaintiff's improper references to
and reliance on Plaintiff's Exhibits 17, 18, 34, and 37," which
Defendant alleges "violated this Court's pre-trial orders
because Dr. Perez did not know about them as of August 4, 2008."
(See Fensterstock Aff. at ¶ 62.)  As with the testimony
regarding omissions in the May 2008 press release, Defendant has
failed to preserve its objections to testimony based on facts
unknown to Defendant on August 4, 2008.

Assuming arguendo that Defendant had preserved its
objection, the allegation of prejudice to Defendant's case is
not persuasive.  Defendant elaborates that Plaintiff referred to
three of the above-listed Exhibits, 17, 18, and 37, when asking
witnesses hypothetical questions[16] filled with assumptions about
clinical study criteria and results.  (See Fensterstock Aff. at
¶¶ 74-80.)  Defendant quotes only one of these exchanges, which
it describes as a "perfect example of Dr. Perez's violation,"

---

[16] There was no prohibition on hypothetical questions.

although Plaintiff does not refer to any Exhibit, whether known

to him or otherwise on August 4, 2008, during the inquiry.  (See

id. at ¶ 75 (quoting Trial Tr. at 153:23-155:7).)  Defendant

repeats with emphasis a series of Plaintiff's questions to Dr.

Wong, which are punctuated with conjecture about hypothetical

clinical trials under assumed conditions, and which culminate in

the following unilluminating question and answer:

> THE COURT: . . . Would that result have met
>
> the advancement criteria to phase 3?
>
> WONG: Under your assumptions, no.

(See id.)  Somewhat paradoxically, Defendant argues that

Plaintiff's hypothetical assumptions were "contradicted by the

evidence and prejudicial to Progenics."  (See id. at ¶ 76.)  It

is the nature of hypotheticals and assumptions to lack truth

value and be immune to contradiction.

The citations in the Fensterstock Affidavit, cited as

examples of Plaintiff's "asking hypothetical questions that

referred to documents he did not have on August 4, 2008" are

underwhelming to say the least.  (See id. at ¶ 74 n.52.)  None

referred to such a document.[17]  The series of citations to the

---

[17] Dr. Perez's reference to Exhibit 17 in his examination of Ms.
Wong is not cited by counsel, but it was also not objected to.
(See Trial Tr. at 162:2.)  Similarly, Dr. Perez's references to
Exhibit 37 in his cross-examination of Dr. Schneider and his
direct of Mr. Madden were not cited by counsel but also were not
objected to.  (See id. at 360:13-361:1; 443:19-23.)

transcript between pages 153 and 163 are a series of
hypothetical questions to Dr. Wong.  In none of them did
Plaintiff tie the questions to any document.  The citations to
transcript pages between 213 and 221 are first, questions to Mr.
Baker regarding whether there were two copies of the Wyeth
Update in circulation – one marked "confidential," as Defendant
maintained, and one not so marked, as Plaintiff maintained, and,
second, about references to the Wyeth Update in Plaintiff's
Exhibits 42 and 43, the letters handed to Dr. Perez on August 5.
The remaining questions to Dr. Madden included two hypotheticals
(see Trial Tr. at 419, 432) and two questions about the Wyeth
Update.  (See id. at 436, 441.)  Accordingly, the Court finds
that Defendant has failed to establish any wrongdoing by
Plaintiff or prejudice to the Defendant on this issue through
the use of hypothetical assumptions, much less that Dr. Perez
relied upon documents of which he was unaware on the critical
date of August 4, 2008, so as to create a miscarriage of
justice.

### 3.    The Wyeth Update Email (Exhibit 35)

Defendant argues that the document marked as Exhibit 35 was
a "highly prejudicial document," which improperly influenced the
jury when it was momentarily published to the jury at times
during the trial and sent into the jury room at the jurors'

request for a period of their deliberations.  (See Def.'s New
Trial Mem. at 6-8.)  First, as with Defendant's other
evidentiary objections, this one was not preserved.  Indeed,
when Dr. Perez initially introduced the document during the
declaration testimony of Mr. Schneider, he informed the Court
and defense counsel that it "was not admitted as evidence, but I
am introducing [it] to impeach the testimony of Dr. Bruce
Schneider."  (See Trial Tr. at 363:2-5.)[18]  After Dr. Perez
reviewed the content of the document, defense counsel read other
portions of Mr. Schneider's declaration (see id. at 364:16-
365:5), then corrected the exhibit number of Exhibit 35 and
noted the date of the exhibit and the date of the press release
(see id. at 365:6-9) - all without objection.

Similarly, as noted above, the Court informed defense
counsel and Plaintiff of the jury's request for exhibits during
their deliberations, including their request for Exhibit 35.
(See id. at 577:14-585:16.)  Defense counsel and Plaintiff
gathered up the requested documents and voiced no objection when

---

[18] Mr. Schneider had testified that documents like the Wyeth
Update "were never circulated widely at Wyeth.
"Q. What steps, if any, were taken to maintain the
confidentiality of this document?  This document referring to
the Wyeth Update.
A. The documents that would go to this committee were never
circulated widely at Wyeth." (Tr. 362:14-22).  In contrast,
Exhibit 35 was an email addressed to some 33 individuals at
Wyeth that attached the Wyeth Update.

the Court received the documents and transmitted them directly to the jury.   After Defense counsel informed the Court that Exhibit 35 had been transmitted to the jury in error, the Court quickly recovered the document and provided the jury with a curative instruction, reminding them of the proper weight to be given to evidence admissible only for its impeachment value:

> THE COURT: . . . We can't go back now and change it.  But I think the jury does have to be instructed that the document was used for impeachment purposes, right.  So they are allowed to use it for the purpose of determining how much of Dr. Schneider's testimony to believe.
>
> Anything else on this?
>
> Mr. B. FENSTERSTOCK: No, your Honor.  In fact, I think when we talked about this, it was actually taken down from the screen.  He [Plaintiff] was able to use it for impeachment, but they weren't even allowed to look at the document.

A few moments later, the Court wrote the following on the jury's note:

> Dear Jurors,

> I sent P # 35 in to you by mistake.  It was
> used only to impeach Dr. Schneider, so you
> should follow the instructions on p. 9 of
> the charge.  Please hand P # 35 to the
> Marshal.
>
> Thank you.
>
> Judge Preska

(See Ct. Ex. 4.)  The Court then had the following exchange with
Defense counsel regarding the curative instruction:

> THE COURT: Gentlemen, I'm going to hand you
> back Court Exhibit 4 which is the jury note
> on which I've written the note back to them.
> I'll let you inspect it before it gets sent
> in.
>
> Mr. B. FENSTERSTOCK: Fine with me.

(See Trial Tr. at 585:11-15.)

In light of the record of these events and the Court's
recollection of the trial, Defendant's allegation that Plaintiff
was "desperate to get the Wyeth Update Email into the hands of
the jury" and that he "took matters into his own hands and put
the document in front of the jury's eyes" is wildly contrary to
the facts.  (See Def.'s Mem. of Law at 7-8, ECF No. 267.)
Indeed, the Court of Appeals has upheld jury verdicts that
followed curative instructions on issues far more grave.  See,

67

e.g., United States ex rel. Smith v. Reincke, 354 F.2d 418, 420-21 (2d Cir. 1965) (upholding first degree murder conviction of defendant after District Court used a curative instruction to mitigate the prejudice of a cooperating witness's confession that implicated the defendant's guilt, although it had been offered "under the guise of impeaching [the witness's] credibility").  Here, counsel sat by silently while Dr. Perez put the document on the screen and summarized it, saying that "it is addressed to a wide audience at Wyeth."  That the jury had physical possession of the document – with others – for a few minutes cannot have caused any prejudice to Defendant over and above the unobjected to viewing and summary in open court. In any event, the incident was in no way seriously prejudicial to the outcome of the trial.  Thus, Defendant's motion on this ground is denied.

### 4.   Late Submission of Job-Search Mitigation Evidence

As noted in Part I.C, supra, the Court heard argument regarding Dr. Perez's offering a document that came to be labeled Defendant's Exhibit 50, a document that he had not turned over, in its entirety,[19] in discovery.  (See Trial Tr. at 366:2-393:16.)  Dr. Perez called the document in question his

---

[19] Plaintiff's work search record through 2011 had been produced to prior defense counsel.  (See Trial Tr. at 368:8-10; fn. 20, infra.)

work search record, and it purported to record almost all of Dr.
Perez's job applications and attempts to find work since his
termination.

Defense counsel argued that the Court should preclude Dr.
Perez from offering the work search record in evidence or
testifying about it because he had failed to produce it and to
provide the information it contained in the discovery.  Defense
counsel noted that on July 9, 2015, before the Final Pretrial
Conference of July 14, 2015, he had emailed Dr. Perez and asked
"for any update on the interrogatories."  (See id. at 322.)
Counsel asserted that he specifically asked Dr. Perez for an
update on his attempts to find alternative employment since his
termination but was unable to locate such a communication.  (See
id. at 324:5-14.)

Dr. Perez explained to the Court that he did not realize
that the work search document would be an exhibit at trial or
that it was part of his ongoing interrogatory obligation,
especially because in 2011 his prior counsel had produced to
prior defense counsel his work search record through some time
in 2011.  (See id. at 326:17-24; 368:8-12.)  He suggested that
he did not think he needed to produce the document because he
only realized the necessity of using it in rebuttal after
hearing Defendant argue on its case in chief that he had failed
to mitigate his losses by failing to search for other

employment.  (See id. at 368:17-25.)  He added that it was his understanding "that you can seek to admit exhibits before resting your case."  (See id. at 378:16-17; 387:14-16.)

Defense counsel noted that prior counsel had asked Dr. Perez about his job interviews during his deposition.  (See id. at 324:20-325:5.)  Dr. Perez had testified at deposition that he had applied to "a large number of companies" (see id. at 375:16-17), and the "[t]he list is long and I keep records of [companies I apply to]."  (See id. at 376:3-4.)  Dr. Perez noted that his prior attorney had responded to the interrogatories and never told him of a continuing obligation to produce updates (see id. at 370:12-16) and that defense counsel's recent reminder about updates to interrogatories was in the context of compensation.  (See id. at 370:17-371:3.)  Dr. Perez also noted that it would be inconceivable that he would knowingly fail to disclose his numerous job applications, especially in light of his understanding that the New York State Department of Labor required that he apply for at least two jobs per week and keep a record of such applications in order to receive unemployment benefits.  (See id. at 386:21-387:6.)

Dr. Perez also noted that an earlier version of the work search record had been produced to prior defense counsel in 2011.  (See id. at 368:8-10.)  Defense counsel said he had no such document, that the last document production was in 2009

70

(see id. at 369:15-18), and that he did not know if prior
counsel had followed up on responses.  (See id. at 384:16-24.)[20]
Counsel and Dr. Perez had different recollections of their
discussions just prior to trial.  (See id. at 367:2-368:5,
370:12-371:25.)

The Court sustained the objection of Defendant's Exhibit
50, the work search record, and permitted defense counsel to
depose Dr. Perez outside of the presence of the jury regarding
his job applications since his termination.[21]  (See id. at
377:15-23.)

Following the deposition, the Court ruled:

> Counsel, as I told you before, and
>
> gentlemen, I have been in this instance
>
> trying to balance our aversion to trial by
>
> ambush these days against the solicitude
>
> that we must pay to pro se litigants.  In
>
> this instance, everyone seems to agree that

---

[20] It turns out that Dr. Perez's recollection about his then-
counsel's producing his work search records to then-defense
counsel in 2011 was correct.  (See Decl. of Julio Perez in Opp.
to Def.'s Mot. for a New Trial or in the (continued)
(continued) Alternative for Remittitur, Dec. 21, 2015, ECF No.
303, Ex. 2, Letter from Christopher P. Keenan, Esq. to Jonathan
Stoler, Esq., June 9, 2011, enclosing, inter alia, Julio Perez's
Work Search Record 5, ECF 303-1.)
[21] The Court notes that defense counsel announced that he would
move for a mistrial if the document came in.  (See Trial Tr. at
379: 22-380:2).  The document did not come in.

in his [prior] deposition, Dr. Perez noted

that he had submitted many, many

applications, but he named three of the

companies he applied to.  We don't seem to

have any indication of any follow-up after

that.

I note that the interrogatories and the

document requests had been promulgated to

Dr. Perez and responded to prior to the time

of the deposition through Dr. Perez's

counsel and through prior counsel for the

defendants.  Again, as I say, we have no

indication of any follow-up after the

deposition asking specifically for documents

relating to the additional applications that

were testified to.

Recently, in the conference on July 14, we

certainly had a discussion about mitigation,

although we seem to think that that was

related to unemployment compensation.  And I

do recall reminding plaintiff that counsel

was going to ask him about that

[unemployment compensation] and ordering

that documents relating to the amount of

unemployment compensation that Dr. Perez

received be produced.

There was no request at that time for an

update on job applications.  Counsel states

and has read the email in I believe it was

July when counsel reminded plaintiff in

general that it was his obligation to update

prior to interrogatories and document

requests.  But given the plaintiff's pro se

situation and given the fact that we had a

mitigation discussion but there was no

request for an update, I will permit Dr.

Perez to testify on rebuttal in general

about his application efforts.

The document will not be received.  Dr.

Perez may use it to refresh his recollection

as he testifies.  We will not have testimony

on every single one of these applications,

but the testimony may be general.

(See id. at 390:15-391:23.)

   Obviously, the jury also credited Plaintiff's testimony –

a conclusion the Court does not disagree with.  It is the

Court's conclusion that Dr. Perez's failure to produce the

entire work search record earlier arose not out of bad faith but

out of this pro se Plaintiff's misunderstanding of his ongoing discovery obligations and the procedure for introducing documents.  (See id. at 366:2-393:16.)  As Dr. Perez noted, it would be counterintuitive for him to withhold evidence of scores of applications.

The Court also notes that any prejudice from the late production was minimal, if any.  The documents attached as Exhibit 2 to Dr. Perez's December 21, 2015 Declaration (see ECF No. 303) – produced to prior defense counsel in 2011 – certainly demonstrate real efforts to obtain employment.  Counsel's questioning Dr. Perez at greater length about a greater number of applications would not have changed the outcome of the case, particularly in light of Dr. Perez's persuasive, credible explanation of why he remained unemployed for so long.  (See Trial Tr. at 409:8-410:18.)  Accordingly, the Court finds that the limited admission of this evidence was not sufficiently prejudicial, if at all, to support Defendant's motion for a new trial.

## 5.   Denial of Defendant's Proffered Evidence

Defendant's argument on this issue concerns Defendant's Exhibit 17, a research policy that was drafted in 2006, and which Defendant argues should have been admitted at trial because the Court initially admitted the exhibit at the final

pretrial conference.  (See Def.'s New Trial Mem. at 11-13.)  As
Plaintiff correctly pointed out (see Pl.'s Mem. of Law at 11,
ECF No. 273), he consented to its receipt into evidence – and
the Court admitted it – before learning that Defense counsel
would attempt to use the 2006 document at trial to establish the
facts of Defendant's 2008 policy, a point on which the document
was clearly irrelevant, as it provided on its face that it had
to be updated no less than annually and was two years out of
date at that point.  (See Trial Tr. at 468:6-472:11.)  In spite
of the Court's ruling, Defense counsel was able to ask defense
witness Dr. Maddon about what the policy actually was in 2008,
so the inability to admit the proffered document was harmless.

### 6.    Plaintiff's Prior Consistent Statement Evidence

This final argument is borderline frivolous when read
within the record.  (See id. at 261:12-276:23.)  Defense counsel
had argued that Plaintiff had fabricated his trial testimony
that he came to possess a copy of the Wyeth Update through
regular inter-office mail.  The Court allowed Plaintiff to
introduce a document from September 2008 in which Plaintiff,
through his attorney, made the same assertion – i.e., that he
received the Wyeth Update through interoffice mail.  The prior
consistent statement was clearly admissible to rebut the
Defense's assertion of recent fabrication.  See Fed. R. Evid.

801(d)(1)(B)(i) ("A Declarant-Witness's Prior Statement [is Not Hearsay if t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is consistent with the declarant's testimony and is offered . . . to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying").

### 7.   Conclusion

In evaluating Defendant's motion for a new trial based on supposedly erroneous evidentiary rulings, the Court notes that the movant must establish a "clear abuse of discretion" that "was so clearly prejudicial to the outcome of the trial" that the jury's verdict was "seriously erroneous" or a "miscarriage of justice."  See Luciano, supra, 110 F.3d at 217 (internal citations and quotations omitted).  The Court "measure[s] prejudice by assessing the error in light of the record as a whole."  See id.  Considering the record as a whole here, it cannot remotely be said that the claimed errors rendered the jury's verdict seriously erroneous or a miscarriage of justice. For the most part, the errors claimed were not preserved, probably because most of them were hyper-technical objections manufactured after the fact.

Viewing the trial as a whole, the Court also notes that Rule 59 authorizes the Court "to grant a new trial based on the weight of the evidence only if it determines that the jury's verdict was seriously erroneous . . . or a miscarriage of justice . . . ." Elyse, supra, 367 F. App'x at 268 (internal citations and quotations omitted). The Court "should only grant such a motion when the jury's verdict is egregious . . . and should rarely disturb a jury's evaluation of a witness's credibility." DLC Mgmt. Corp., supra, 163 F.3d at 134 (internal citations and quotations omitted).

By this standard, there is no question that the jury's verdict here was correct. As to the first question put to the jury, whether Plaintiff engaged in protected activity (see Gattegno, supra, 353 F. App'x at 500) and specifically whether a person of Dr. Perez's training and experience had both a subjective belief and an objective, reasonable belief that the conduct complained of constituted a violation of the law (see Perez, supra, 965 F. Supp. 2d at 363-64), the jury clearly credited Dr. Perez's testimony on this topic. A comparison between the press release (see Def's Ex. V, ECF No. 62-22) and the Wyeth Update (see Def's Ex. W, ECF No. 62-23) confirms that the jury's verdict was not egregious.

The second question asked of the jury, whether the circumstances were sufficient to raise the inference that the

protected activity was a contributing factor in the adverse
employment action, (see Gattegno, supra, 353 F. App'x at 500),
presented a clear factual issue that the jury resolved in
Plaintiff's favor.  It is the Defendant's position that Dr.
Perez was terminated because he would not disclose how he had
obtained the Wyeth Update.  Dr. Perez testified (and Messrs.
Baker (see Trial Tr. at 216:15-217:21) and McKinney (see id. at
180:18-181:5) agreed) that on August 4, when he was asked how he
obtained the Wyeth Update, he requested a chance to consult with
his attorney, which permission was granted.[22]  Dr. Perez
testified that at the August 5 meeting he was immediately given
the letters (see Pl.'s Ex. 42 and 43) which he took as a
termination.  Messrs. Baker (see Trial Tr. at 227:18-228:17) and
McKinney (see id. at 316:11-317:24) testified that after Dr.
Perez was given the letters, Mr. Baker asked him how he came
into possession of the Wyeth Update, that Dr. Perez did not
answer, and that it was only then that he was terminated.

As noted above, Dr. Perez testified:

> Mr. Baker claims that in the termination
> meeting he told me if you don't give me --
> words to the effect that if you don't tell
> me how you got the document, I will

---

[22] Mr. McKinney testified that Dr. Perez did not refuse to tell
him on August 4 how he received the document. (Tr. 181:11-16)

> terminate you and that I did not answer.
> That did not happen.  During that meeting I
> was not asked that question directly or
> indirectly in any way, shape, or form.  It
> turns out that later I find out that the
> decision to terminate had been made before
> that meeting and this is shown in the next
> exhibit that I will show you.

(See id. at 34:23-35:6.)

On the topic of when the decision to terminate Dr. Perez
was made, Dr. Perez introduced the minutes of the August 5 Audit
Committee meeting.  After noting receipt of Dr. Perez's August
4, 2008 memorandum, the minutes stated:

> The Company consulted with outside counsel
> and determined that it was necessary to
> terminate the employee as it was apparent
> that he had some access to confidential
> information.  The employee was subsequently
> terminated on August 5, 2008.

(See Pl.'s Ex. 44, Minutes of a Meeting of the Audit Comm. of
the Bd. of Dir. of Progenics Pharm., Inc. 2 (Aug. 5, 2008)
(emphasis added).)  Mr. Baker was also examined with respect to
the Audit Committee minutes and the decision to terminate Dr.
Perez and (see Trial Tr. at 227:4-228:17) maintained that he did

not make the decision to terminate Dr. Perez until the August 5 meeting after Dr. Perez supposedly remained silent when asked how he obtained the Wyeth Update.

The jury clearly credited Dr. Perez's testimony that the termination occurred immediately at the outset of the August 5 meeting, thus rejecting the defense position that he was terminated for failure to disclose how he obtained the Wyeth Update.  The Court does not find that decision to be incorrect, much less egregious.

Weighing the evidence, as the Court is permitted to do on a Rule 59 motion, (see DLC Mgmt. Corp, supra, 163 F.3d at 134) there is no question that the jury was correct.  Defendant's main witnesses were not credible.  As noted above, Mr. Baker was condescending, contemptuous, patronizing, and hostile to Dr. Perez; Ms. Wong was uncooperative and, at times, patronizing (see, e.g., Trial Tr. at 152:18; 153:21; 154:22-155:7; 156:11-157:6; 158:24-159:13); and Mr. Madden was evasive and uncooperative.  (See, e.g., id. at 419:16-423:22; 427:14-16; 428:3-436:2-18; 448:15-16.)

In stark contrast, Dr. Perez presented as a credible witness, trying his best[23] to relate information in a truthful, straightforward, and accurate manner.  The Court is firmly

---

[23] As noted above, English is not Dr. Perez's first language.

convinced that the jury's verdict was correct.  Accordingly,
Defendant's motion for a new trial is denied.

**B.      Remittitur**

In the alternative, Defendant requests remittitur of the
compensatory damages awarded by the jury, arguing that (1)
Plaintiff failed to mitigate damages, (2) the jury's damages
calculation was impermissibly based on speculation, and (3)
Plaintiff unnecessarily delayed trial.

As a threshold matter, "[i]t is well settled that
calculation of damages is the province of the jury." Ismail v.
Cohen, 899 F.2d 183, 186 (2d Cir. 1990).  Where a jury's damages
verdict is impermissibly excessive, remittitur "is the process
by which a Court compels a plaintiff to choose between reduction
of [the] verdict and a new trial." Earl v. Bouchard Transp.
Co., Inc., 917 F.2d 1320, 1328 (2d Cir. 1990) (citations and
quotations omitted).  The Court enjoys broad discretion in this
regard.  The Court of Appeals has held that it

> will not review the action of the trial
> court in granting or denying a motion for a
> new trial for error of fact.  This rule has
> been frequently applied where the ground of
> [the] motion was that the damages awarded by
> the jury were excessive or inadequate.

Stevenson v. Hearst Consol Pub., 214 F.2d 902, 910 (2d Cir.
1954) (quoting Fairmount Glass Works v. Cub Fork Coal Co., 287
U.S. 474, 481 (1933) (internal quotations omitted)).  If damages

are excessive and remittitur is necessary, the Court must use the "least intrusive" standard for reducing compensation – that is, "remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." Earl, 917 F.2d at 1330.

## 1.   Failure to Mitigate

Defendant argues that Plaintiff is not entitled to the jury's award because he failed to mitigate his damages by reasonably seeking employment elsewhere after being terminated from Progenics.  (See Mem. of Law in Supp. of Def.'s Mot. for a New Trial or in the Alternative for Remittitur ("Def.'s New Trial Mem.") 14-18, Sept. 10, 2015, ECF No. 267.)  Defendant is correct that a discharged employee must "use reasonable diligence in finding other suitable employment," which need not be comparable to their previous positions.  (See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir. 1998) (citing Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 231 n.15 (1982), a Title VII case, for the rule that a former employee who did not make reasonable efforts to search for other suitable employment failed to mitigate his damages and was not entitled to compensatory damages under the Americans with Disabilities Act).  Although no provision of Sarbanes-Oxley explicitly addresses a wrongfully terminated employee's duty to mitigate, at least one

other district court within this Circuit has found that the body
of parallel damages law suggests that the Act includes an
implicit duty to mitigate like that found in the other anti-
discrimination statutes.  See Trusz v. UBS Realty, 2016 WL
1559563, at *11, (D. Conn. Apr. 18, 2016) (citing Hobby v.
Georgia Power Co., 2001 WL 168898, at *15 (ARB 2001); see Smith
v. Lake City Enter., 2012 WL 6066526, at *2 (ARB 2012)).

    Here, Plaintiff testified on rebuttal that he applied for
jobs continuously from August 19, 2008 (two weeks after
Defendant terminated him) until the week before trial.  (See
Trial Tr. at 398:8-14.)  He testified at some length on this
subject, describing an expanding job search that included
companies as far away as Massachusetts, North Carolina,
California, Canada, and Puerto Rico.  (See id. at 395:17-396:5.)
He also testified that he expanded his search beyond the
pharmaceutical industry, in which he had worked for more than
fifteen years, to other chemical companies.  (See id. at 396:6-
13.)  Dr. Perez also testified about various factors that
militated against his re-employment, including the recession
that began about the same time as his termination, the length of
his unemployment, his age at the time of termination (58), and
the fact of this action.  (See id. at 409:8-410:18).

    The jury was aware of Plaintiff's duty to mitigate, having
received an instruction on this subject from the Court, (see id.

at 572:22-573:3), and defense counsel argued in his summation that Dr. Perez failed to mitigate. (See id. at 526:11-258:19.) Clearly, the jury credited Dr. Perez's testimony in this regard, as reflected by its verdict in his favor. (See Jury Verdict Form at ¶¶ 1-3.)  The Court will not reverse the jury's credibility finding - with which it agrees.

### 2.   Damages Calculation

As for Defendant's argument that the jurors' calculation of Plaintiff's damages was "unduly speculative" (see Def.'s Mem. of Law at 19, ECF No. 267), the record provides no support for such a proposition.  Defendant also argues that the jury's award should be reduced by the amount of money Plaintiff received in unemployment compensation after Defendant terminated him.  (See Def.'s New Trial Mem. at 20.)

On the second point, Defendant is correct that the deduction of unemployment benefits from an award for wrongful termination is permissible as a matter of equity because, as the Court of Appeals has reasoned, "We see no compelling reason for providing the injured party with double recovery for his lost employment . . . ."  E.E.O.C. v. Enter. Ass'n Steamfitters Local No. 638 of U. A., 542 F.2d 579, 592 (2d Cir. 1976) (affirming the District Court's deduction of "public assistance" from back pay award).  Defendant asserts that "the jury did not consider

84

that Dr. Perez received unemployment insurance benefits in an amount of $41,920.00 when awarding him back pay damages.  (See Def.'s New Trial Mem. at 21 (citing Trial Tr. at 323:10-14; 527:12-528-13).)  Defendant's cited passages of the Trial Transcript do not support its assertion regarding the jury's consideration.

In the first cited passage, Plaintiff and Defense counsel are discussing Plaintiff's late production of his employment search record.  (See Trial Tr. at 321:20-323:14.)  This occurred during a break in the trial, with the jury not present.  (See id. at 319:1.)  In that passage, Plaintiff informs the Court that he and Defense counsel had engaged in telephone conversations, in the context of discovery proceedings, as to whether there was documentation of Plaintiff's receiving any compensation after his termination from Progenics.  (See id. at 323:10-13.)  Plaintiff states, "[T]here has been no consideration other than unemployment benefits."  (See id. at 323:13-14.)  This cited passage is not in any way probative of whether or not the jury considered Plaintiff's collection of unemployment benefits when calculating his back pay award.

In the Defendant's second cited passage, Defense counsel is arguing in summation that Plaintiff failed to mitigate his damages by refusing to seek or accept offers of comparable employment.  (See id. at 527:12-528:13.)  In this very passage,

Defense counsel tells the jury that Plaintiff spent three years collecting unemployment benefits "in the sum of about $41,000 . . . ." (See id. at 527:14-15.)  Contrary to Defendant's argument, this passage indicates that the jury was aware of Plaintiff's collection of unemployment benefits during the time after his termination.  Also, the Court specifically instructed the jury that it "must reduce [P]laintiff's damages by any amount defendant has proved by a preponderance of the evidence that [P]laintiff actually earned after his termination or that [P]laintiff could have earned . . . ." (See id. at 573.)  On this record, Defendant's argument that the jury was unaware of Plaintiff's receipt of unemployment benefits or that it failed to subtract those benefits in its calculation of its damage award is frivolous.

Contrary to Defendant's assertion that Plaintiff "fail[ed] to introduce any evidence regarding his compensation," (See Def.'s Mem. Of Law at 19, ECF No. 267).  Plaintiff did in fact offer, and the Court received, Exhibit 16, the multiple-page compensation document described in Part I.D, supra. (See Trial Tr. at 319:3-320:13.)  This document alone is sufficient to support the verdict against any claim that it was speculative. It also distinguishes this case from the case on which Defendant relies, Tse v. UBS Fin. Servs., where the Court ordered a new trial after a Plaintiff, represented by counsel, presented to

86

the jury a damage calculation that the Court noted on the record appeared to be "remarkabl[y] misleading." See 568 F. Supp. 2d 274, 306 (S.D.N.Y. Feb. 19, 2008). Here, there is no reason to suspect that Plaintiff's conservative income projections, described in Part I.D, supra, were in any way misleading or insufficient to support the jury's damage award in his favor.

### 3.   Trial Delay

Defendant's argument in this regard is premised upon the same factual allegations that Defendant raised in its opposition to Plaintiff's motion for prejudgment interest in Part II.A, supra: that Plaintiff delayed trial in a deliberate attempt to get a bigger money judgment and he failed to mitigate his damages. (See Def.'s New Trial Mem. at 22.)  For the reasons listed in Part II.A, supra, the Court finds that Defendant has failed to establish that Plaintiff delayed trial unnecessarily in a manner sufficiently prejudicial to justify remittitur.

## 4.   Conclusion

Accordingly, the Court denies Defendant's motion for remittitur.

### IV. CONCLUSION

The previously-entered judgment (ECF No. 250) is withdrawn.

For the foregoing reasons, Plaintiff's motion for prejudgment interest (ECF No. 257) is granted.  The parties shall re-calculate prejudgment interest through September 9, 2016 (or the nearest month end), consistent with the resolutions herein, and submit those re-calculations no later than September 8.

Plaintiff's motion for reinstatement (ECF No. 259) is granted as to his front pay claim in the amount of $2,706,585.00.

The motion by Plaintiff's former counsel, Westermann, Sheehy, Keenan, Samaan, & Aydelott, LLP, for attorney's fees (ECF No. 262) is denied in part as to the attorney's fees and granted in part as to leave to renew its motion for a charging lien, provided that the motion is filed no later than September 9.  The Court will allow Plaintiff ten days from the Court's entry of a charging lien to file his motion for attorney's fees.

Defendant's motion for a new trial or, in the alternative, for remittitur (ECF No. 265) is denied.

SO ORDERED.

Dated:    New York, New York
          August 30, 2016

*Loretta A. Preska*

_____
LORETTA A. PRESKA
United States District Judge